**BELLINGHAM FROZEN FOODS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 78–3017.

United States Court of Appeals, Ninth Circuit.

Submitted Feb. 13, 1980.

Decided Aug. 7, 1980.

Rehearing Denied Sept. 26, 1980.

Eugene R. Nielson, Lane, Powell, Moss & Miller, Seattle, Wash., for petitioner.

William R. Stewart, Washington, D. C., argued for respondent; Elliott Moore, Washington, D. C., on brief.

Before DUNIWAY and ANDERSON, Circuit Judges, and BONSAL,* District Judge.

DUNIWAY, Circuit Judge:

Bellingham Frozen Foods, Inc. (Bellingham) petitions for review of a Decision of the National Labor Relations Board. The Board cross-appeals for enforcement of the Order. The Decision and Order, dated September 1, 1978, are reported at 237 N.L.R.B. No. 113.

We will enforce the order in part, and we set aside the order in part.

## I. *Facts.*

Since 1965, Bellingham Cold Storage, a different corporation from Bellingham, has leased a vegetable processing and packing plant to a series of food processing firms. In 1974 San Juan Packers (San Juan) became the third lessee of the plant. San Juan encountered financial difficulties and filed a petition in bankruptcy in 1977. Bellingham purchased San Juan's assets and leasehold at a bankruptcy sale. On April 4, 1977, Bellingham began operating the plant except for the "repack" business which San Juan was permitted to operate until it fulfilled certain outstanding obligations. In July 1977, Bellingham also took over operation of the repack business.

Each of the lessees, including Bellingham, has operated the plant in substantially the same fashion: Vegetables are obtained from farmers and the plant processes and packs the vegetables for sale to its customers. Because the entire harvest cannot be sold fresh, some of the processed vegetables are stored frozen in bulk and "repacked" during the winter and spring in smaller packages covered with retailers' wrappers.

The basic nonseasonal workforce consists of 10 repack employees, 10 plant maintenance employees and 10 field shop employees. Because each vegetable has a different processing season, varying numbers of seasonal processing employees are employed during the processing season which runs from early July to December or January. Thus, when peas are processed, from early July to late August, 20 to 30 seasonal employees are hired. Bean processing generally begins in August, continues until early or middle September, and requires 60 to 70 additional employees. Corn is processed from early to mid September until mid October by 60 employees on two shifts. Carrots are processed in the fall and into late November or early December, and require two shifts of 35 employees each. After each crop is completely processed the employees are usually retained to help with the processing of the next crop harvested. The plant has traditionally maintained a seniority list of seasonal employees and has recalled these employees in order of seniority when it needs additional processing employees.

In 1966, Kynden Berry Growers, then the lessee of the plant, voluntarily recognized the Union as the exclusive bargaining agent of the production and maintenance employees at the plant. Succeeding lessees of the plant also recognized the Union as the representative of the bargaining unit, which is described in the last collective bargaining agreement with San Juan as:

> . . . all employees performing work in the Company's processing plants and warehouses located in Bellingham, Washington or in sheds or lots adjacent thereto where commodities or materials are processed or stored, except office employees, superintendents; foremen having the power to hire and discharge; regular weigh-masters and fieldmen. . . .

Historically, this unit included both seasonal and nonseasonal workers. Seasonal employees were covered by the contracts while

---

* The Honorable Dudley B. Bonsal, Senior United States District Judge for the Southern District of New York, sitting by designation.

they performed seasonal processing work; they were also given the opportunity, as positions opened and in order of seniority, to bid on nonseasonal employment.

On September 4, 1975, the Union was elected the exclusive bargaining representative of a unit of San Juan's office clerical employees. In November, 1975, a complaint was filed with the Board against San Juan alleging interference with employees' right to organize and discriminatory discharge in violation of §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act, (29 U.S.C. §§ 8(a)(1) & (3)) during the course of the clerical workers' union organizing campaign and its immediate aftermath.

After Bellingham took over the plant in 1977, a meeting was scheduled with Marvin Eggert, the Union's representative, on April 14. At this meeting, Hayes, President of Bellingham, expressed strong feelings that seasonal workers should not be included in the bargaining unit. Following the meeting, Eggert sent Hayes a contract. On April 22, Hayes responded denying any obligation to bargain with the Union. On April 29 Bellingham employees voted to strike if Bellingham maintained its position. Negotiations continued between Hayes and Eggert through the beginning of May. On May 13 Hayes presented Eggert with a proposed contract excluding seasonal employees from the bargaining unit. The next day the employees voted to reject the contract offer. Eggert called a strike on May 16 and the employees struck on that date.

Throughout the strike contract negotiations continued with little change in the parties' positions. In June, Bellingham began to hire seasonal employees, ignoring the Union seniority list and inviting all previous employees to apply for jobs. In the end of May and throughout June, Bellingham began replacing some of the strikers, although the new employees were not specifically designated as replacements for particular strikers. On June 24 Eggert told Hayes that the strikers unequivocally offered to return to work and that the seasonal employees on the seniority list were also ready to work. Hayes responded saying that all but six strikers had been permanently replaced and that Bellingham refused to recognize preferential rights of seasonal workers based on San Juan's seniority list.

In July, 1977, a complaint was filed with the Board against Bellingham alleging unlawful refusal to bargain with the Union, discrimination against strikers, and interference with the organizing rights of employees. In addition, the complaint alleged that as a successor to San Juan, Bellingham was jointly and severally liable for any unremedied unfair labor practices committed by San Juan.

After a hearing, the Administrative Law Judge found that San Juan had violated sections 8(a)(1) and (3) of the Act by terminating Lillian Huber, a clerical employee, because of her union activities, and section 8(a)(1) of the Act by committing other acts which interfered with its clerical employees' statutory right to select the Union as their bargaining representative. The A. L. Judge also found that Bellingham was the successor to San Juan in the production and maintenance unit and thus was bound to recognize the Union as the representative of the employees in that unit, both seasonal and nonseasonal, and that Bellingham first agreed voluntarily to recognize and bargain with the Union as the representative of those employees, but later breached its bargaining obligations under the Act in three ways. These were (1) by refusing to continue recognizing the Union as representative of all the seasonal employees in the production and maintenance unit, (2) by insisting on excluding seasonal employees from the contract covering that unit, and (3) by making unilateral changes in unit working conditions. In addition, the A. L. Judge found that Bellingham violated sections 8(a)(1) and (3) of the Act by refusing the unconditional requests of ten unfair labor practice strikers, including Marvin W. Eggert, who was found to be an "employee" under the Act, to return to their jobs, and by telling employees that it would not agree to a contract unless the employees accepted an agreement which excluded seasonal employees from the unit.

678

The A. L. Judge proposed, and the Board issued, two orders—one against San Juan and one against Bellingham. Each requires the particular employer to cease and desist from violating the Act in the manner found and from interfering with the statutory rights of its employees in any manner. The principal affirmative requirement of the order against San Juan is that San Juan, jointly and severally with Bellingham, make Lillian Huber whole for any loss of pay she may have suffered because of her discriminatory discharge. On May 8, 1979, we granted the Board's motion for default judgment to enforce this order against San Juan. The Board's finding that the discharge of Huber was a violation of § 8(a)(3) is supported by substantial evidence. Thus the only issue here is the enforceability of this order against Bellingham.

The order against Bellingham affirmatively requires it to bargain collectively with the Union as the exclusive bargaining representative of all the employees in the production and maintenance unit as historically composed, to reinstate any terms of employment existing on April 4, 1977, when Bellingham became the employer, and to make employees whole for any losses they may have incurred as a result of Bellingham's unilateral changes in their terms and conditions of employment, including changes in the seniority lists and recall procedures. The order further requires Bellingham to reinstate ten named strikers and make them whole for any losses they suffered by virtue of Bellingham's previous refusal of their requests for unconditional reinstatement. Finally, in addition to the usual notice-posting requirement, the order requires Bellingham, as San Juan's successor with knowledge of San Juan's unfair labor practices, to offer discriminatee Huber reinstatement and, jointly and severally with San Juan, to make her whole for losses suffered as a result of her discharge. The Board adopted the Decision of the A. L. Judge without change.

II. *Bellingham's Duty to Bargain.*

■ "It is a settled principle that when employees have bargained collectively with an employer and there occurs a change of ownership not affecting the substantial nature of the enterprise, the successor employer must recognize the incumbent union and deal with it as the bargaining representative." *Tom–A–Hawk Transit, Inc. v. NLRB*, 7 Cir., 1969, 419 F.2d 1025, 1026–1027. *Accord*: *NLRB v. Burns International Security Services, Inc.*, 1973, 406 U.S. 272, 279, 92 S.Ct. 1571, 1577, 32 L.Ed.2d 61; *NLRB v. Dent*, 9 Cir., 1976, 534 F.2d 844, 846. If a majority of the employees in the unit after the purchase were in the unit before the purchase, there is a duty to bargain, it being assumed that the holdover majority continues to desire representation by the Union. *Pacific Hide & Fur Depot, Inc. v. NLRB*, 9 Cir., 1977, 553 F.2d 609, 611.

■ Nevertheless, a purchaser of assets is under no obligation to hire employees of a predecessor and is free to set the initial terms of employment for these employees should it decide to hire them. Employees are also free to accept or reject the terms offered. Therefore,

[I]t may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit as required by § 9(a) of the Act, 29 U.S.C. § 159(a).

*Burns, supra*, 406 U.S. at 295, 92 S.Ct. at 1586.

However, the Court also said (406 U.S. at 294–295, 92 S.Ct. at 1585–1586):

Although a successor employer is ordinarily free to set initial terms on which it will hire employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms.

When it is "perfectly clear" that the employer intends to hire a majority of his workforce in a unit represented by a union from the ranks of his predecessor, his duty

to bargain with the Union commences immediately.[1]

The A. L. Judge found that "the employees of . . . San Juan, including the seasonal employees, would be the primary source for . . . Bellingham's staffing needs, so long as such employees were available." and that "subsequent events only fortify the conclusion that . . . Bellingham's pre-takeover intent had been to staff the facility with the former employees of . . . San Juan, save for the office clericals." The A. L. Judge and the Board found this case illustrative of the "perfectly clear" scenario envisioned by the Court in *Burns, supra.*

■ We are required by the Act, § 10(e), 22 U.S.C. § 160(e), to sustain the findings of the Board if they are supported by substantial evidence on the record taken as a whole. *Universal Camera Corp. v. NLRB*, 1951, 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456. The Act makes such findings "conclusive." With regard to Bellingham's intent to hire a majority of its employees from those who previously worked for San Juan in the production and maintenance unit, the findings of the A. L. Judge adopted by the Board are "conclusive."

■ When Hayes, the President of Bellingham, talked with Eggert, the Secretary-Treasurer of the Union on March 16, about the Union's collective bargaining agreement for the plant, Hayes said that he would employ all but "some" of San Juan's employees in the production and maintenance unit. In contrast, Hayes was adamant in asserting that Bellingham intended to bring in its own office employees. Nor was there any suggestion when Bellingham began operating the plant that the unit would not remain intact. Employees were asked informally to remain in their current positions without having to apply to Bellingham for employment. On the morning of the takeover, Hayes assembled the employees and as the Board found, "the message he

conveyed was confined to an appeal to get the equipment ready for the processing season and an assurance that they would continue to be paid at the same rates and that their pay checks would be honored. Indeed Hayes conceded [in his testimony] that no pre-takeover changes in terms and conditions of employment had been planned or formulated." Bellingham maintained virtually all previous working conditions for a week after the takeover. Therefore, unlike that in *Spruce Up Corp.*, 1974, 209 NLRB 194, *enforced*, 4 Cir., 1975, 529 F.2d 516 (memorandum), and its progeny, the offer of employment by Bellingham was not conditioned upon an employee's acceptance of changed terms and conditions of employment. *See generally, International Association of Machinists v. NLRB*, 1978, D.C.Cir., 595 F.2d 664, 672 n.40. The Board was warranted in concluding that it was "perfectly clear" that Bellingham intended to staff the plant with a sufficient number of San Juan employees to trigger a bargaining obligation as a successor employer. *See NLRB v. Dent, supra*, 534 F.2d at 846 n.2. *See also Int'l Assn. of Machinists v. NLRB, supra* ; *Spitzer Akron, Inc. v. NLRB*, 6 Cir., 1976, 540 F.2d 841, 845; *NLRB v. Bachrodt Chevrolet Co.*, 7 Cir., 1972, 468 F.2d 963, 969, *vacated on other grounds*, 1973, 411 U.S. 912, 93 S.Ct. 1547, 36 L.Ed.2d 304, *enforced*, 7 Cir., 1975, 515 F.2d 512 (memorandum).

Bellingham's hiring actions following the April 4 takeover strengthen the Board's finding that Bellingham's intent was to hire the San Juan employees. Not only was the initial production and maintenance unit composed entirely of former San Juan employees, but San Juan employees also continued to constitute a majority of the unit for a substantial period of time after the takeover. Former San Juan workers were not outnumbered in the unit until the payroll period ending August 20, almost five months after Bellingham began to operate

---

1. However, the obligation of a successor employer is merely to recognize the union and to bargain; it is not bound by the substantive provisions of a collective bargaining contract negotiated by its predecessor but not agreed to or assumed by it. *Burns, supra*, 406 U.S. at 284, 92 S.Ct. at 1580.

the plant. A significant number of the persons on the seniority list applied for seasonal positions. Almost everyone who did apply was hired including one employee listed as an inadequate performer. The A. L. Judge stated:

> While these events occurred after April, they do shed light upon Respondent Bellingham's intent as it existed at the time of the takeover. First they show that in using the term "some," Hayes had been acknowledging that only a minority of the employees on the seniority list were so inadequate that Respondent Bellingham would prefer not to employ them. Second, they confirm what Hayes' comments of March 16 implicitly acknowledged: That, as a practical matter, the employees of Respondent San Juan, including the seasonal employees, would be the primary source for Respondent Bellingham's staffing needs, so long as such employees were available. Finally, no evidence of any business need was presented to show that a change in procedure for securing seasonal employees was necessitated. (footnote omitted).

Bellingham only challenged the Union's representative status once it became clear from its contract negotiations that the Union would not agree to change the bargaining unit to exclude seasonal employees. By this time, Bellingham's obligation to bargain with the Union had already occurred. That obligation occurred as soon as it was perfectly clear that Bellingham intended to accept San Juan employees as its own in the production and maintenance unit. In fact, the Board found that Bellingham, in acknowledgment of its obligation to bargain, recognized the Union voluntarily—a finding supported by substantial evidence. Bellingham's subsequent actions may not dissolve that obligation to bargain.

Because Bellingham's obligation to bargain accrued at the time it took over the plant it could not unilaterally change the terms and conditions of employment after it specified the terms and conditions on which San Juan employees would be retained. *Burns, supra,* 406 U.S. at 294–295, 92 S.Ct. at 1585–1586. Because Bellingham did not change any terms and conditions of employment until a week after it took over the plant, the Board's order properly required it to make whole nonseasonal and seasonal employees for any losses they suffered because of the changes.

 Bellingham does not challenge the unfair labor practice findings on any ground other than its contention about its obligation to bargain with the Union. It is not disputed that it refused to bargain with the union as the representative of the seasonal as well as the nonseasonal workers. An employer cannot unilaterally change the scope of a recognized bargaining unit. Bellingham's attempt to do so made the strike an unfair labor practice strike entitling ten workers to unconditional reinstatement.[2] Thus, we will enforce the order of the Board insofar as it requires Bellingham to bargain with the Union for the production and maintenance unit, to make its employees whole for any injuries resulting from its refusal to bargain and to remedy the unfair labor practices it committed in connection with the unfair labor practice strike that followed its refusal to bargain.

### III. *Obligation to Remedy Unfair Labor Practices of San Juan.*

Although the Board found that Bellingham was a successor employer, obligated to bargain with the Union with respect to the production and maintenance unit, this does not necessarily mean that Bellingham was a

---

**2.** One of the ten unfair labor practice strikers deserving reinstatement is Marvin W. Eggert, although Bellingham claims that Eggert was a supervisor and not an employee protected under Sections 8(a)(3) and (1). The Board rejected this claim stating that after Norm Coker was hired as general plant foreman, Eggert "no longer possessed any of the indicia of supervisory activity [listed in Section 2(11)], accompa-

nied by ability to exercise independent judgment." The Board's determinations of this sort are entitled to great deference in light of its special expertise. *See, Marine Engineers Beneficial Ass'n v. Interlake Steamship Co.,* 1962, 370 U.S. 173, 179–180, 82 S.Ct. 1237, 1240, 8 L.Ed.2d 418. Bellingham presents no convincing reason why we should not defer to the Board in this instance.

successor employer for all purposes. *Howard Johnson Co. v. Hotel Employees*, 1974, 417 U.S. 249, 262–263 n.9, 94 S.Ct. 2236, 2243, 41 L.Ed.2d 46. In determining in this context whether Bellingham is required to remedy the unfair labor practices of San Juan, it is necessary to consider what the obligations of Bellingham are to the office clerical employees presently employed.

The answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor law in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc.

*Id.*

In *Golden State Bottling Co. v. NLRB*, 1973, 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388, the Court required a purchaser of a business to reinstate an employee whom the predecessor employer had illegally discharged. That case differs from this one in that there the new employer was a successor employer under the *Burns* test for purposes of the bargaining unit from which the employee had been discharged, while in this case there was no finding that Bellingham was a successor employer for purposes of a bargaining obligation in the unit involved, the unit of office clerical workers. The employer's status in relation to a particular unit is determinative of its designation as a successor. *See Pacific Hide & Fur Depot v. NLRB, supra*, 553 F.2d at 614, *citing NLRB v. John Stepp's Friendly Ford, Inc.*, 9 Cir., 1964, 338 F.2d 833, 836. From its earliest contacts with the Union, Bellingham asserted its intention to provide its own clerical employees, and the record does not dispute that it did so. There was no finding, nor could there have been, that it was "perfectly clear" that Bellingham was a successor employer for purposes of bargaining with the clerical workers. Bellingham's failure to hire San Juan's clerical

employees was never attributed to any anti-union animus. *See Howard Johnson Co. v. Hotel Employees, supra*, 417 U.S. at 262 n.8, 94 S.Ct. at 2243, and cases cited therein.

As the Court recognized in *Golden State, supra*, 414 U.S. at 184 n.6, 94 S.Ct. at 425:

A purchasing company cannot be obligated to carry out . . . every outstanding and unsatisfied order of the Board. For example, because the purchaser is not obligated by the Act to hire any of the predecessor's employees, the purchaser, if it does not hire any or a majority of those employees, will not be bound by . . . *any order tied to the continuance of the bargaining agent in the unit involved.*

(citations omitted) (emphasis added).

We think that the order to reinstate Huber, who was an office clerical worker discharged by San Juan for her union activities, is an order tied to the continuance of the bargaining agent in the office clerical worker unit. As to that unit, Bellingham is not a successor, and the order requiring it to reinstate Huber cannot stand. When Bellingham took over, it did not employ any of the office clerical workers employed by San Juan. If Huber had been reinstated before Bellingham took over, presumably she, like the other office clericals, would not have been hired by Bellingham.

### Judgment

The portion of the Board's order that requires reinstatement of Huber by Bellingham (Paragraph 2(a)) is set aside, and the notice ordered by the Board to be posted, Appendix B to the Board's order of September 1, 1978, shall be modified accordingly. In all other respects, the order of the Board will be enforced.[3]

---

3. We have previously enforced the Board's order against San Juan, in our No. 78–3491, June 20, 1979, modified, Oct. 24, 1979, by deleting all references therein to liability on the part of Bellingham.