208 F.3d 801 (9th Cir. 2000)
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW), AMALGAMATED LOCAL UNION No.509, AFL-CIO, Petitioner-Intervenor,
v.
ADVANCED STRETCH FORMING INTERNATIONAL, INC.,Respondent.
 No. 97-71047
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted April 13, 1999
Filed April 4, 2000
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 COUNSEL: Sharon I. Block, National Labor Relations Board, Washington, D.C., for the petitioner.
 Henry M. Willis, Schwartz, Steinsapir, Dohrmann & Sommers, Los Angeles, California, for the petitioner-intervenor.
 Larry Walraven, O'Melveny & Myers, Newport Beach, California, for the respondent.
 On Application for Enforcement of an Order of the National Labor Relations Board
 Before: Robert Boochever, Diarmuid F. O'Scannlain and A. Wallace Tashima, Circuit Judges.
 Opinion by Judge Boochever;
 Dissent by Judge O'Scannlain
 BOOCHEVER, Circuit Judge:
 
 
 1
 We decide whether a successor employer has a duty to bargain with an incumbent union before unilaterally imposing terms when the employer hires its initial workforce from the ranks of a represented bargaining unit of its predecessor.
 
 
 2
 * Advanced Stretchforming International, Inc., ("ASI") manufactures structural body components used in the aerospace industry at a facility in Gardena, California. Prior to ASI's tenure, Aero Stretch, Inc. ("Aero") engaged in the same operations at the same site. Aero and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Local No. 509 ("UAW" or "Union") entered into a collective bargaining agreement ("CBA") for production and maintenance employees effective August 19, 1991 through August 19, 1994.
 
 
 3
 On June 11, 1992, Aero filed for bankruptcy under Chapter 11 of the Bankruptcy Act. Aero continued to operate, but gradually laid off employees. UAW representative Duane LaMothe contacted Aero's management over the ensuing months to check on Aero's bankruptcy status. At a November 19, 1992, hearing, the bankruptcy court converted Aero's bankruptcy to a Chapter 7 case and auctioned its assets.
 
 
 4
 Stephen Brown submitted the successful bid. As a condition of the sale, the bankruptcy judge ordered Aero to cease operations and to terminate all employees by November 30. On November 30, Brown called Aero's Manufacturing Director, Eric Cunningham, and told him to inform Aero employees that they could report to the plant the next day to interview for positions with ASI, which Brown incorporated on December 1. Cunningham called a meeting of Aero's employees and informed them that the plant had been purchased, and that all employees would be terminated at the end of the day, but that they should report to the plant the next day to interview for positions if they were interested in working for ASI. Two employees present at the meeting, and LaMo the, who was also present at the meeting, testified that Cunningham told the employees that there would be "no union, no seniority, no nothing" at ASI. Cunningham denied making such a statement, but testified that at some point he told the employees that ASI would not assume Aero's CBA.
 
 
 5
 On December 1, Brown interviewed and hired Cunningham as ASI's general manager. Brown and Cunningham then interviewed Aero's former employees who came to the plant that day. Brown required each applicant to sign the following statement:
 
 
 6
 I UNDERSTAND THAT I WILL BE WORKING UNDER NEW TERMS AND CONDITIONS WHICH IS NOT A CONTRACT AND IS SUBJECT TO CHANGE.
 
 
 7
 NEW COMPANY IS NOT ASSUMING COLLECTIVE BARGAINING AGREEMENT.
 
 
 8
 YOU MAY BE EMPLOYED BY NEW COMPANY ON AN AT WILL BASIS.
 
 
 9
 DETAILED LIST OF TERMS AND CONDITIONS IS TO FOLLOW.
 
 
 10
 During the interviews, Brown informed each applicant that the new terms of employment would include different wages, no 401(k) plan, less vacation time, fewer holidays, no medical or dental benefits and at-will employment.
 
 
 11
 ASI hired eight of the seventeen former Aero production and maintenance employees. Four were hired at Aero's hourly rate; two received more and two received less.
 
 
 12
 UAW sent certified letters to ASI on December 3, 7, and 11, demanding that ASI recognize the Union as its employees' bargaining representative. UAW filed an unfair labor practice charge against ASI on December 11. On December 14, ASI conducted a poll of its employees regarding their desire for continued union representation. The employees voted against union representation. That same day, ASI's counsel wrote the union a letter advising that ASI did not recognize the UAW as the representative of its employees. On April 30, 1993, the National Labor Relations Board ("NLRB" or "Board") issued a complaint and notice of hearing against ASI.
 
 
 13
 After conducting a hearing, an Administrative Law Judge ("ALJ") found that ASI had violated sections 8(a)(1) and (5) of the National Labor Relations Act ("NLRA") by (1) making the "no union" statement at the November 30 meeting, (2) improperly polling its employees regarding union representation on December 14, and (3) refusing to recognize and to bargain with UAW, as ASI was required to do as an alleged "successor" employer to Aero. The ALJ, however, rejected the General Counsel's claim that ASI had further violated the NLRA by setting the initial terms of employment on December 1. The ALJ reasoned that under NLRB v. Burns Int'l Sec. Servs., Inc., 406 U.S. 272 (1972), ASI had the right to establish initial employment terms when it hired Aero's former employees.
 
 
 14
 The NLRB's General Counsel appealed the ALJ's decision that ASI did not violate the NLRA by setting the initial hiring terms, and the Board reversed. The Board reasoned that ASI had forfeited its right to set the initial terms of employment because "it unlawfully blocked the process by which the obligations and rights" of a successor are incurred when it made the "no union" statement. Advanced Stretchforming Int'l, 323 N.L.R.B. 529, 531 (1997). Thus, the Board held that ASI unlawfully and unilaterally changed the employment terms without first bargaining with the union. Id.
 
 
 15
 Based on its conclusions, the Board adopted the ALJ's recommended order, but added to it, directing ASI,"in order to remedy [the] unlawful unilateral changes," to rescind any changes in employees' terms and conditions of employment unilaterally effectuated and to make the employees whole by remitting all wages and benefits that would have been paid absent [ASI's] unlawful conduct, until [ASI] negotiates in good faith with the Union to agreement or impasse.
 
 
 16
 Id.
 
 
 17
 The Board timely applied to this court for enforcement of its order.
 
 II
 
 18
 In the proceedings before the Board, ASI did not challenge the ALJ's findings that ASI violated sections 8(a)(1) and (5)[1] of the NLRA. Section 10(e) of the NLRA provides that"[n]o objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. S 160(e). "The failure [ ] of the employer to object to the ALJ's findings before the Board precludes the raising of those issues on appeal." Idaho Falls Consol. Hosps., Inc. v. NLRB, 731 F.2d 1384, 1386 (9th Cir. 1984).
 
 
 19
 Thus, ASI could not, and, indeed, does not, challenge the Board's rulings on the "no union" statement, the union representation poll and the refusal to bargain with UAW. Accordingly, the Board's "finding of those unfair labor practices violations must be taken as established," id., and we grant summary enforcement of the Board's order with respect to those findings. See Gardner Mechanical Servs., Inc. v. NLRB, 115 F.3d 636, 643 n.2 (9th Cir. 1997).[2]
 
 III
 
 20
 ASI does challenge, however, the Board's finding that ASI violated sections 8(a)(1) and (5) of the NLRA by unilaterally changing its employees' terms and conditions of employment when they were hired on December 1. ASI claims that it was privileged to set the initial terms upon which it would hire former Aero employees. The Board argues that ASI forfeited this right when it informed Aero's employees that it intended to operate without a unionized workforce. Resolution of this issue requires a review of what has come to be known as the "successorship doctrine" -a body of labor law which governs the rights and obligations of "successor " employers.
 
 
 21
 * Central to this body of law is the "Burns rule," which provides that when a new employer acquires a business, it is free, generally, to set the initial terms and conditions of employment, and is not bound by its predecessor's CBA. See Burns, 406 U.S. at 281-82, 287-88, 294-95. Despite this freedom, however, the new employer must recognize and bargain with the union representing its predecessor's employees if the new employer is a "successor" employer. See id. at 281; Kallmann v. NLRB, 640 F.2d 1094, 1100 (9th Cir. 1981). A new employer is a successor if "the [new] employer conducts essentially the same business as the former employer, and . . . a majority of the new employer's work force are former employees or would have been former employees absent a refusal to hire because of anti-union animus." Id.[3]
 
 
 22
 ASI concedes that it must be treated as a successor employer. Thus, as the ALJ found, and the Board affirmed, ASI had a duty to recognize and to bargain with UAW, Aero's employees' representative. ASI failed to fulfill this duty and, thus, the Board found that it violated the NLRA.
 
 
 23
 ASI disputes, however, the Board's separate determination that it violated sections 8(a)(1) and (5) by "unilaterally changing its employees' wages and other terms and conditions of employment at the time of their hire." Advanced Stretchforming, 323 NLRB at 529. The Board identified the "only issue" in this case as "whether [ASI], as a successor employer obligated to recognize the Union's continuing status as a collective-bargaining representative, had the legal right to establish unilaterally its initial terms and conditions of employment for bargaining unit employees." Id. Because the Supreme Court held in Burns that "a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor," despite its duty to bargain with its predecessor's employees' union,[4] 406 U.S. at 294, ASI would indeed have been free to set initial hiring terms when it began operations on December 1, unless an exception to this general rule applied.
 
 B
 
 24
 One qualification to the rule in Burns is the "perfectly clear" exception. The duty to bargain with an incumbent union arises when it becomes evident that the union represents a majority of the employees hired by the new employer. See id. at 281 ("[W]here the bargaining unit remains unchanged and a majority of the employees hired by the new employer are represented by a recently certified bargaining agent [the Board may] order[ ] the employer to bargain with the incumbent union."). In some cases, such as Burns itself, the duty to bargain is not evident until the employer has hired its full initial complement of employees, "since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit . . . ." Id. at 295. In such cases, it is not an unfair labor practice unilaterally to impose initial terms of employment, because at that point, the duty to bargain has not yet arisen. See id. But in other cases, it will be "perfectly clear that the new employer plans to retain all of the employees in the unit," and thus apparent from the outset that the incumbent union represents a majority of the employees. Id. at 294-95. In these cases, "it will be appropriate to have [the employer] initially consult with the employees' bargaining representative before he fixes terms." Id. at 295.
 
 
 25
 The duty to bargain before imposing terms is based on the fact that a majority of the successor employer's initial workforce have chosen to be represented by an incumbent union. Therefore, the example given in Burns itself, where the successor hires all of the predecessor's employees (and presumably few others), is not exhaustive of the perfectly clear exception. The Burns perfectly clear exception to the right of the employer to set the initial terms of employment applies whenever it is apparent that the incumbent union continues to represent a majority of the initial workforce. Thus we have held that "[i]f a majority of the employees in the unit after the purchase were in the unit before the purchase, there is a duty to bargain, it being assumed that the holdover majority continues to desire representation by the [u]nion. " Bellingham Frozen Foods, Inc. v. NLRB, 626 F.2d 674, 678 (9th Cir. 1980). "When it is `perfectly clear' that the employer intends to hire a majority of his workforce in a unit represented by a union from the ranks of his predecessor, his duty to bargain with the [u]nion commences immediately." Id. at 678-79.
 
 
 26
 The circumstances surrounding the takeover in this case strongly indicate ASI's intent to hire its initial workforce from the ranks of its predecessor. At a meeting the day before the takeover, Cunningham told Aero's employees to report to the plant at the regular time the next day if they wished to apply for employment with ASI. Two witnesses testified, and the ALJ concluded, that Cunningham stated that ASI intended to hire some Aero workers immediately, and others as work became available. ASI then hired all eight of its initial unit employees from Aero's ranks. There is no evidence that ASI interviewed any non-Aero employees. After their interviews, the unit employees continued work that had been in progress at Aero and commenced similar work for ASI.
 
 
 27
 ASI's hiring activities after the takeover are also substantially identical to those that we considered indicative of an intent to hire the predecessor's employees in Bellingham. In Bellingham, the successor hired all of its initial workforce from its predecessor, and then continued to hire its predecessor's former employees for many months as work and vacancies permitted. Id. at 679. Here, after hiring its initial workforce exclusively from Aero's ranks, ASI continued to hire former Aero unit employees to expand its workforce as business permitted. ASI did not hire its first non-Aero employee until several months after the takeover, and three of the four non-Aero employees in the unit when the ALJ hearing commenced in September 1993 were not hired until ASI had already hired fifteen of the seventeen former Aero unit employees. At no time did former Aero employees cease to constitute an overwhelming majority of the unit under ASI.
 
 
 28
 Under such circumstances, it is perfectly clear that ASI intended from the outset to constitute the majority of its workforce from the ranks of its predecessor, and its duty to bargain therefore commenced immediately. Consequently, it was an unfair labor practice for ASI to impose terms without first consulting with the union.
 
 IV
 
 29
 The Board did not address the application of the perfectly clear exception to the circumstances of this case, but instead found that ASI had forfeited its right to impose initial terms under U.S. Marine Corp. v. NLRB, 944 F.2d 1305 (7th Cir. 1991), by declaring that there would be no union, and by conducting an improper poll. Because we find that the perfectly clear exception to the Burns rule applies in this case, we need not take up the Board's application of the forfeiture doctrine to affirm its finding that ASI's unilateral imposition of terms violated Sections 8(a)(5) and (1) of the NLRA.
 
 
 30
 The dissent contends that in so doing, we "ignore[ ] basic tenets of administrative law," because we must uphold the Board's order under the forfeiture doctrine, or not at all. Slip op. at 815. The general rule is of course well established that "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." SEC v. Chenery Corp., 318 U.S. 80, 95 (1943). But the rule is not so broad as the dissent would suggest. "The rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." SEC v. Chenery Corp. (Chenery II), 332 U.S. 194, 196 (1947) (emphasis added); see also Fleshman v. West, 138 F.3d 1429, 1433 (Fed. Cir.), cert. denied, 119 S. Ct. 371 (1998) ("[Chenery] does not prohibit a reviewing court from affirming an agency decision on a ground different from the one used by the agency if the new ground is not one that calls for a determination or judgment which an administrative agency alone is authorized to make." (quotations omitted)).
 
 
 31
 "[T]he court is not so bound when, as here, the issue in dispute is the interpretation of a federal statute." Railway Labor Executives' Ass'n v. Interstate Commerce Comm'n, 784 F.2d 959, 969 (9th Cir. 1986). Directly on point is North Carolina Commission of Indian Affairs v. United States Department of Labor, 725 F.2d 238, 240 (4th Cir. 1984), on which we relied in Railway Labor Executives. In North Carolina Commission, the administrative judge found that the Comprehensive Employment and Training Act of 1973, 29 U.S.C. S 801, implicitly authorized the Department of Labor to obtain repayment from states of improperly paid funds. The court of appeals affirmed, but on the ground that the right to repayment was express in the statute under the rationale of Bell v. New Jersey and Pennsylvania, 461 U.S. 773 (1983). See North Carolina Comm'n, 725 F.2d at 240-41.
 
 
 32
 Here, the issue is whether Sections 8(a)(5) and (1) of the National Labor Relations Act require a successor employer to bargain collectively before imposing terms when it hires its initial complement of workers entirely from the ranks of a represented unit. This is an issue of statutory interpretation, see Burns, 406 U.S. at 277-81, and one that we decided conclusively in Bellingham, 626 F.2d at 678-79. The Board's forfeiture rationale, adopted from the Seventh Circuit's decision in U.S. Marine, is simply an alternative gloss on the same statutory provisions, but one that has not been likewise conclusively established in this circuit. We do not transgress Chenery by enforcing the Board's order under a better established interpretation of the same statutory provisions on which the Board relied in reaching its result.
 
 
 33
 Moreover, we are not required to remand when it is certain that the agency would reach the same result under the correct rule. See Vista Hill Found., Inc. v. Heckler, 767 F.2d 556, 566 n.9 (9th Cir. 1985). "Chenery does not require that we convert judicial review of agency action into a ping-pong game." NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 n.6 (1969). As a litigant, the Board has pressed the perfectly clear rationale at every stage in these lengthy proceedings. The factual predicate for the application of the perfectly clear doctrine has been exhaustively developed in the record below. Were we to decline to adopt the Board's forfeiture rationale, and remand instead of deciding thequestion of ASI's liability, Bellingham would still dictate the ultimate result. "A remand is not required when it would be an idle and useless formality . . . ." Vista Hill Found., 767 F.2d at 566 n.9 (quotations omitted).[5]
 
 V
 
 34
 We turn next, therefore, to the remedy that the Board imposed for the violation. To remedy ASI's failure to consult with the Union before imposing terms, the Board ordered ASI to recognize the Union, and to pay back wages and benefits under the CBA from the time of the violation until ASI negotiated in good faith to a bargain or impasse.
 
 
 35
 Though a successor has a duty to bargain with an incumbent union before imposing terms when it hires an essentially intact bargaining unit from its predecessor, the successor has "no obligation to accept his predecessor's labor agreement." Kallman, 640 F.2d at 1103. Consequently, when employees are awarded back pay running from the time the successor acquires the business until it finally bargains to an agreement or an impasse pursuant to a duty to bargain imposed after lengthy proceedings, employees may receive far more than they would have if the violation had never occurred. Thus we have held that "to the extent that a back pay order requires payment at the higher rate for the entire period of ownership, it acts as a penalty." Id. Rather, "an appropriate back pay remedy cannot require [the successor] to pay the higher rate beyond a period allowing for a reasonable time of bargaining." Id.
 
 
 36
 This limitation on the period for which back pay may be awarded applies, however, only when it is clear that the successor "lawfully would not have agreed to the wage scale provided by the predecessor's labor agreement, and the resulting impasse would have resulted in reduced wages. " New Breed Leasing Corp. v. NLRB, 111 F.3d 1460, 1467 (9th Cir. 1997). Whether bargaining would have resulted in impasse had the violation not occurred will often be a matter of some uncertainty. In New Breed we held that any such uncertainty "should be resolved against the employer who discriminates," and we therefore placed the burden of persuasion on the successor to show that it would not have agreed to the higher wages. Id. at 1468.
 
 
 37
 In reaching this conclusion, we were persuaded by the Seventh Circuit's reasoning in U.S. Marine, 944 F.2d at 1321, that a successor should not benefit from an ambiguity that results from its own wrongdoing. Thus in New Breed, where the successor "failed to shoulder its evidentiary burden," we found that "the Board's grant of back pay based on the predecessor Union's pay scale restores as nearly as possible the employment situation that would have occurred absent" the unfair labor practice. New Breed, 111 F.3d at 1468-69. But where, as in Kallman, "[t]he facts demonstrate that [the successor] would not have agreed to union demands to pay the higher rate," the successor may not be required "to pay the higher rate beyond a period allowing for a reasonable time of bargaining." Kallman, 640 F.2d at 1103.
 
 
 38
 In fashioning its remedy in this case, the Board applied the presumption that an award of back pay and benefits under the repudiated bargaining agreement restores the status quo ante, but did not consider whether ASI had rebutted that presumption with evidence that it would have bargained to an impasse and imposed less favorable terms. See New Breed, 111 F.3d at 1468; see also U.S. Marine, 944 F.2d at 1323 ("[I]t is for theemployer to demonstrate that it is not appropriate [to award back pay]. U.S. Marine has failed to do so." (quotations, citations, and original alterations omitted)). Nor did the ALJ make any findings in this regard, as the ALJ did not award back pay and benefits under any exception to the Burns rule.
 
 
 39
 Those facts that are in the record and bear on this question are equivocal. The ALJ found that of the eight Aero unit employees originally hired on December 1, 1992, four received the same hourly wage they had previously been paid by Aero, two received significantly more, and two received significantly less. ASI provided less vacation time and paid holidays, however, and no medical or dental benefits. Nevertheless, the ALJ found little to indicate that ASI could have found a qualified workforce outside of Aero's ranks had ASI not been able to come to terms with the incumbent union. The ALJ noted that ASI had rejected transferring employees from a machine shop that Brown owned in Gardena due to the unacceptable commute, and found that, to continue Aero's business, ASI needed a workforce with specialized skills that were not readily available in the marketplace.
 
 
 40
 The mere fact that ASI provided fewer benefits under the terms that it imposed provides little indication of what ASI might have agreed to had it fulfilled its obligation to bargain with the Union. The apparent unavailability of qualified workers outside of the Aero unit and the need to complete Aero's work in progress indicate that the Union might have brought significant negotiating power to the table. On the other hand, the fact of Aero's bankruptcy indicates that ASI might have been unwilling or even unable to continue to operate the business without significant labor concessions, and might have chosen to liquidate the company's assets rather than continue operating under the terms of the previous CBA.
 
 
 41
 Were the question regarding what would have happened had ASI recognized and bargained with the Union presented to us on a record that was ambiguous despite having been fully developed under the correct legal standard, we would resolve any uncertainty by affirming the Board's award under New Breed. See New Breed, 111 F.3d at 1468. Because the record was not fully developed on this point, however, we remand to permit ASI and the UAW to present evidence on whether ASI would have bargained to impasse and imposed terms, even if ASI had honored its obligation to bargain with the Union as it was required to do under the perfectly clear exception to the Burns rule.
 
 VI
 
 42
 The Petition for Enforcement is GRANTED IN PART and REMANDED IN PART. Each party shall bear its own costs.
 
 
 
 Notes:
 
 
 [1]
 Section 8(a)(1) provides, in pertinent part, that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" their collective bargaining rights. 29 U.S.C. S 158(a)(1).
 
 
 [2]
 To remedy these violations, the Board's order requires that ASI (1) cease and desist these unfair labor practices; (2) recognize and bargain with UAW; (3) make various company records available for Board inspection; (4) post notices at its facilities informing its employees that it will no longer engage in any unfair labor practices; and (5) file a sworn certification with the NLRB's Regional Director that it has taken steps to comply with the order. ASI does not challenge these remedies.
 
 
 [3]
 Although a new employer is not required to hire its predecessor's employees, see Howard Johnson Co. v. Detroit Local Joint Exec. Bd., 417 U.S. 249, 261-62 (1974), the new employer may not lawfully refuse to hire them because of their union affiliation, see Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 40 (1987).
 
 
 [4]
 Thus, a new employer may begin operations pursuant to terms that it has set and operations may proceed under those terms while the new employer is fulfilling its duty to bargain with the union until agreement or impasse. See Kallmann, 640 F.2d at 1102 (stating that Burns held that "a successor employer is ordinarily free to set initial hiring terms without preliminary bargaining with the incumbent union"). If the employer fulfills its duty to bargain in good faith with the union, and the employer and the union are unable to agree on the terms of employment, the employer may continue to operate under the terms it initially set. See Burns, 406 U.S. at 295.
 
 
 [5]
 The dissent asserts that "[t]here is no basis for the majority's asserted confidence that the Board would, on remand, reach the same result that the majority now embraces . . . ." Slip Op. at 806 n.1. If our confidence is misplaced, as the dissent suggests, the Board is free to petition for rehearing on that ground.
 
 
 O'SCANNLAIN, Circuit Judge, dissenting:
 
 43
 The court's opinion frames the issue before us as "whether a successor employer has a duty to bargain with an incumbent union before unilaterally imposing terms when the employer hires its initial workforce from the ranks . . . of its predecessor." Supra at 804. With respect, I suggest it is the wrong question. Worse yet, the majority compounds the error by giving the wrong answer to that question.
 
 
 44
 * The National Labor Relations Board ("NLRB" or "Board") has applied to this court for the enforcement of its order, which declares in part that Advanced Stretchforming International ("ASI") violated the National Labor Relations Act (the "Act") by "unilaterally changing wages and benefits" without first bargaining with the union that had previously represented the individuals whom ASI ultimately hired. The Board based this element of its order on its conclusion that ASI had "forfeited" its otherwise unquestioned right to set the initial terms and conditions of employment by peremptorily and impermissibly stating that there would be "no union " at its workplace. Naturally, the Board urges the enforcement of its order on this score; ASI is opposed. The majority agrees with the conclusion of the Board but does not endorse its logic.
 
 
 45
 The majority substitutes its own argument for that of the Board on the issue of whether ASI's imposition of novel terms and conditions of employment was unlawful. ASI's new terms and conditions violated the Act, the majority holds, not because ASI made its impermissible "no union " statement but because ASI had made it "perfectly clear" that it intended to man its workforce with the employees of its predecessor. See supra at 808 ("Because we find that the perfectly clear exception to the Burns rule applies in this case, we need not take up the Board's application of the forfeiture doctrine . . . ."). The majority's reliance on its own argument is plainly impermissible, for, as the Supreme Court has "often held, the validity of an agency's determination must be judged on the basis of the agency's stated reasons for making that determination." Industrial Union Dept., AFL-CIO v. American Petroleum Inst., 448 U.S. 607, 631 n.31 (1980).
 
 
 46
 The majority asserts that the scope of our review need not be limited to determining the validity of the grounds actually advanced in the Board's order, because the majority can affirm the order with the " `interpretation of a federal statute,' " supra at 809 (quoting Railway Labor Executives' Ass'n v. ICC, 784 F.2d 959, 968 (9th Cir. 1986)), which is not a type of determination that the Board " `alone is authorized to make,' " id. (quoting SEC v. Chenery Corp. (Chenery II), 332 U.S. 194, 196 (1947)). I must disagree. The majority is administering the Act--not interpreting it--with the unilateral declaration that ASI committed an "unfair labor practice" when it set the initial terms of employment and shortly thereafter hired eight of its predecessor's employees. If this were not the sort of determination that the Board is uniquely authorized to make, I would be hard pressed to conceive of what is.[1]
 
 
 47
 This court is constrained, therefore, to consider the validity of the Board's stated reasons for concluding that ASI's conduct violated the Act. Because the court has not done so, it would be improvident for the court now to remand the Board's order for findings on the sustainability of the Board's desired remedy.
 
 II
 
 48
 Considerations of administrative law aside, the court's holding practically eviscerates the rule of NLRB v. Burns International Security Services, Inc., 406 U.S. 272 (1972). In Burns, the Supreme Court established that a new employer is presumptively free to set the initial terms and conditions of employment without negotiating with a union, even if the new employer is the "successor" of an organization whose employees were represented by that union. Id. at 294 (noting that, even though the successor employer's terms differed from those of the old employer, "it does not follow that [the successor employer] changed its terms and conditions of employment when it specified the initial basis on which employees were hired" (emphasis added)). The Court has underscored that this presumption will be overborne only in "exceptional situation[s]." see Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 47 n. (1987).
 
 
 49
 The Burns rule derives from the well-established principle that an employer's duty to bargain with a union does not arise until it transpires that a majority of the employer's workforce has chosen to be represented by that union. See id. at 295 (noting that the duty to bargain does not mature before it is "evident . . . that the bargaining representative represents a majority of the employees in the unit"). See generally NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural, and Ornamental Iron Workers, 434 U.S. 335, 344 (1978) (noting "the generally prevailing statutory policy that a union should not purport to act as the collective-bargaining agent for all unit employees, and may not be recognized as such, unless it is the voice of the majority of the employees in the unit"). Because the preference for union representation amongst the majority of employees cannot be determined before the composition of the workforce is established, the composition of the workforce generally cannot be established before the employees are hired, and employees cannot be hired without the employer's stating the initial terms of employment, it is pure syllogism that the employer cannot generally be held to negotiate with a union before the employer has set the initial terms of employment.
 
 
 50
 As the Court noted in Burns, however, there are some circumstances in which the composition of an employer's workforce can be established before the employees are hired. In these circumstances, the foregoing syllogism breaks down. One such circumstance arises when "it is perfectly clear that the new employer plans to retain all of the employees [of its predecessor]." Burns, 406 U.S. at 295. When the new employer's plan is "perfectly clear," the preference for union representation of the employer's future workforce is equally clear. Hence, the new employer can fairly be required to negotiate with the union before setting the initial terms of employment. This is the "perfectly clear" exception to the Burns rule.
 
 
 51
 The critical element of the "perfectly clear" exception is that of timing: When can an employer be said to have known of the composition of its future workforce and thus of its duty to bargain with a union? See Burns, 406 U.S. at 294 ("[T]here is no evidence that Burns ever unilaterally changed the terms and conditions of employment it had offered to potential employees in June after its obligation to bargain with the union became apparent." (emphasis added)). Nothing in our case law suggests that the issue of timing has lost its relevance. Indeed, courts applying the "perfectly clear" exception continue to rely explicitly on the fact that the successor employer plainly intended--prospectively--to retain the predecessor's employees before setting the initial terms of employment. See, e.g., Canteen Corp. v. NLRB, 103 F.3d 1355, 1363 (7th Cir. 1997) (noting that the NLRB had found that " `the [new employer] had effectively and clearly communicated to the Union its plan to retain the predecessor employees' " (emphasis added)); Bellingham Frozen Foods, Inc. v. NLRB, 626 F.2d 674, 679 (9th Cir. 1980) (noting that the statements of the new employer's president supported the NLRB's conclusion "that it was `perfectly clear' that [the employer] intended to staff the plant with a sufficient number of [predecessor] employees to trigger a bargaining obligation" (emphasis added)).
 
 
 52
 Applying the "perfectly clear" exception to this case thus requires evidence establishing that ALI planned--before setting the initial terms of employment--to hire at least the majority of its employees from the workforce of its predecessor, Aero Stretch, Inc. ("Aero"). See Bellingham, 626 F.2d at 678-79. Neither the Board nor the administrative law judge ("ALJ") found such evidence.[2] Nevertheless, the majority does. See supra at 808 ("The circumstances surrounding the takeover in this case strongly indicate ASI's intent to hire its initial workforce from the ranks of its predecessor.") The evidence on which the majority relies, however, falls far short of establishing the existence of ASI's plan. The majority first observes that an agent of ASI told Aero's employees that they should report to the plant on the first day of ASI's operation if they wanted to apply to work for ASI. An invitation to apply for work, however, is far from a statement of the employer's intention to hire the applicant. The majority also notes that ASI's agent stated that "ASI intended to hire some Aero workers immediately, and others as work became available." See supra at 808. Because ASI's intent to hire some Aero workers cannot establish that former Aero workers would constitute the majority of ASI's workforce, this evidence, too, is irrelevant. Cf. Bellingham, 626 F.2d at 679 (relying on the successor employer's statement that it would "employ all but `some' of the [predecessor's] employees" (emphasis added)). The majority also relies on the fact that "there is no evidence that ASI interviewed any non-Aero employees" immediately. See supra at 808. That no evidence of such interviews appears in the record hardly establishes that such interviews did not occur. Furthermore, the majority's reliance on a lack of evidence for ASI's position suggests --wrongly--that a successor, barring evidence to the contrary, is presumed to have made "perfectly clear" a plan to hire most of its employees from its predecessor.
 
 
 53
 All the "evidence" marshaled by the majority, then, boils down to ASI's actual recruitment practices. See supra at 808 ("ASI then hired all eight of its initial unit employees from Aero's ranks."). That an employer ultimately did something, however, does not establish that what the employer would do was "perfectly clear." See Burns, 406 U.S. at 295 ("[I]t may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union." (emphases added)). The majority attempts to sidestep this embarrassingly elementary point by noting that we relied in Bellingham on an employer's ultimate hiring practices in evaluating the earlier transparency of its plans. See supra at 808 (citing Bellingham, 626 F.2d at 679). Bellingham posed a different issue, however. In that case, we were called upon to determine whether substantial evidence supported the Board's conclusion that an employer's hiring plans had been "perfectly clear." We were not conducting de novo review, and we did not state that we would have reached the same conclusion as the Board if we were. Moreover, the facts in Bellingham presented other probative evidence in addition to the employer's ultimate recruitment practices. The majority here marshals no additional probative evidence whatsoever.
 
 
 54
 The majority sets the standard for applying the "perfectly clear" exception so low that the exception can only swallow the rule. This outcome does not merely flout the decision of the Supreme Court in Burns. It also invites every successor employer to discriminate against the employees of its predecessor. Anything else would only increase the successor employer's risk of being found to have plainly intended to hire its predecessor's employees all along--and the concomitant risk of having retroactively forfeited its presumptive (and valuable) right to set the initial terms and conditions of employment.
 
 
 55
 The majority ignores basic tenets of administrative law, flouts Supreme Court precedent, and worsens the plight of American workers facing the insecurity of a failed employer. I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 By way of contrast, our decision in Railway Labor Executives exemplifies the type of statutory interpretation that we may undertake in considering a novel basis on which to affirm an agency's order. In that case, an order of the ICC was challenged because the ICC refused to impose certain labor protections as a condition of its approval of the sale of a railroad line. See 784 F.2d at 961. A third party attempted to justify the ICC's refusal by arguing that Congress had not given the ICC any discretion to impose such protections. See id. at 969. Even though the ICC had not attempted to defend its action in this way, we noted that we could consider the third party's proposed justification for the ICC's order, because the issue of whether the ICC had the discretion at issue involved only the "interpretation of a federal statute." Id. Quite unlike the grounds advanced by the majority here, the novel basis we considered in Railway Labor Executives in no way involved the application of substantive terms of a statute for reasons not adopted by the agency in the order under review.
 The majority's attempt to analogize the substitution of its own reasons for those of the NLRB in this case to the Fourth Circuit's decision in North Carolina Commission of Indian Affairs v. United States Department of Labor, 725 F.2d 238 (4th Cir. 1984), is unavailing. In that case, as in Railway Labor Executives, the reasoning at issue related to the scope of the agency's power under a federal statute. See id. at 240. As the Fourth Circuit took pains to note, "[t]he interpretation [was] wholly different from what it is in the case where Congress specifically entrusts an administrative agency, because of its special competence, with the task of . . . setting up standards or rules of conduct." Id. (quoting Milk Transport v. ICC, 190 F. Supp. 350, 355 (D. Minn. 1960)). In this case, however, the majority is, in fact, applying a "rule[ ] of conduct": A successor employer may not unilaterally set the initial terms of employment "when it hires its initial complement of workers entirely from the ranks of a represented unit." Supra at 810.
 The majority is on no more solid footing in suggesting that its alternative reasoning is merely meant to avoid the conversion of " `judicial review of agency action into a ping-pong game.' " Supra at 810 (quoting NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 n.6 (1969)). There is no basis for the majority's asserted confidence that the Board would, on remand, reach the same result that the majority now embraces, for the Board has repeatedly and notably declined to rely on the "perfectly clear" exception as a basis for its order--and there are good reasons for the Board's hesitation. See infra.
 
 
 [2]
 This alone, of course, should foreclose our consideration of the matter, for, as an appellate court, we are generally not authorized to find facts at this stage.