Bruce S. ANDES, et al., Louis S. Aronica, et al., Appellants,

v.

FORD MOTOR COMPANY, Appellee.

Nos. 94–7252, 94–7253.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 31, 1995.

Decided Dec. 8, 1995.

Rehearing Denied Jan. 24, 1996.

William A. Dobrovir, argued the cause, for appellants. Cornish F. Hitchcock entered an appearance.

Robert N. Eccles, argued the cause and filed the brief, for appellee. Michael J. O'Reilly entered an appearance.

Before: WALD, SILBERMAN, and WILLIAMS, Circuit Judges.

SILBERMAN, Circuit Judge:

Appellants challenge the district court's summary judgment determining that Ford Motor Company's decision to sell its Dealer Computer Services (DCS) subsidiary, and the resulting loss of benefits to the DCS employees, did not violate § 204(g) or § 510 of ERISA. Since no Ford benefit plan was amended as required by § 204(g) and Ford did not "discharge, fine, suspend, expel, discipline, or discriminate" against a DCS employee within the meaning of § 510, we affirm.

## I.

The basic facts are undisputed. Appellants represent 60 former employees of DCS, a subsidiary of Ford Motor Company. DCS' primary function was providing Ford dealers with computer services. In 1990, Ford experienced sharply reduced profits and had losses exceeding $2.25 billion in 1991. In early 1990, Ford management set a 20% reduction in personnel costs by 1995 target for its North American Automotive Operations. In 1990, Ford had a committee evaluate the possibility of selling DCS. The committee recommended that DCS be sold, despite DCS' profitability every year from 1974 to 1990. The rationale given was that DCS was a "non-core" activity which would require the investment of Ford resources that could be spent more productively on other operations. At Ford's Board of Director's meeting in June of 1991, Ford's objectives were described as receiving a reasonable sale price, ensuring fair treatment for its dealers and employees, and retaining some influence over the future technological development of DCS. In its "Offering Memorandum" circulated to potential buyers, Ford expressed its intention that the acquiring company adopt "pay and benefits comparable in overall value to existing arrangements." Universal Computer Services' (UCS) offer was announced as the best bid on November 27, 1991, and the purchase agreement with UCS was consummated on January 31, 1992. After March 1991, DCS employees who requested to transfer out of DCS or participate in Ford's Voluntary Termination Plan, a program which offered certain incentives for Ford employees to resign, were refused permission. The DCS employees were given the option of either working for Ford Dealer Computer Services (FDCS), UCS' new name for DCS, at 100% of their Ford salaries, excluding benefits, or lose their jobs. UCS had indicated to Ford that it would be "weeding out personnel with less desirable skills" after a performance evaluation period of 12 to 18 months. When UCS started discharging FDCS employees, Ford rehired some of them. Indeed, 32 of the 60 employees represented by appellants now work at Ford.

As a result of the sale, the former DCS employees did not receive all of the benefits that they otherwise would have ultimately received as Ford employees. Particularly, Ford's General Retirement Plan (GRP) provides for early retirement benefits for an "active member" who either has 10 years of employment at Ford after 1950 and is at least 55 years old or has 30 years of employment at Ford after 1950. Accordingly, working at FDCS does not count toward the years-of-employment-eligibility requirement. Some of Ford's personnel people suggested permitting DCS employees who were close to vesting to "grow into" early retirement benefits despite this limitation. According to the deposition of Ford Vice President Mr. Hausman, Ford rejected this proposal because the GRP was a "very generous plan" to begin with, a "cutoff" point had to be established, and allowing a "grow in" in this sale would establish a precedent for future sales of portions of Ford Corporation. Ford also rejected a proposal that Ford retain approximately

40 people and lease them to UCS in order to protect them against being laid off by UCS.[1]

While Ford realized significant pension savings—an estimated $18.8 million—by selling DCS, Ford notes that DCS employees were, on average, younger and had fewer years of Ford service, factors that are correlated with benefit costs. Ford provided a "Welcome Aboard" cash bonus to the transferred DCS employees, which Ford anticipated would cost $1.75 million, and one month's free coverage under Ford's welfare benefit plans. Unlike previous sales, Ford rejected a proposal to transfer GRP assets to a separate retirement plan for the FDCS employees. While UCS indicated that it would not establish such a benefits plan because of administrative and legal complications, it did agree to replicate Ford's severance benefits for one year and to provide a periodic cash bonus for each employee equal to a portion—allocated by reference to various factors—of the total value of projected Ford benefits that DCS employees lost. UCS also agreed to allow Ford to have some continuing influence on FDCS' prices and technological development. Ford urged its dealers to stay with FDCS, telling them the change would be "transparent" with Ford Motor Credit continuing to finance FDCS' sales. Appellants characterize the sale merely as an "outsourcing" in which Ford continued to "control FDCS' performance of its functions," even though UCS paid $103 million ($53 million of which was financed by a Ford loan) for DCS.

The district court rejected appellants' arguments that these facts establish that Ford ran afoul of the § 204(g) prohibition on decreasing accrued benefits through an amendment of an employee pension plan and their § 510 claim that the former DCS employees were discharged by Ford with the purpose of interfering with the attainment of their pension rights. Appellants contend that the "district court erred by weighing the evidence and inferences itself and resolving the [§ 510] intent issue against appellants." Appellants' challenge is not to the facts summa-

rized above (which stem from pleadings, documents and depositions), but rather to the appropriate inferences to be drawn from these facts, particularly as to Ford's purpose. Appellants, of course, are correct that these inferences should be drawn in their favor.

## II.

Appellants, even with the benefit of all disputed inferences, seek to stretch the words "amendment of the plan" as used in § 204(g). That section provides:

(1) The accrued benefit of a participant under a plan may not be decreased by an *amendment* of the plan, other than an amendment described in section 1082(c)(8) of this title.

(2) For purposes of paragraph (1), a plan amendment which has the effect of—

(A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations)

. . . . .

with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits.

29 U.S.C. § 1054(g) (1985) (emphasis added).

It is argued that since the DCS employees, because of the sale and their termination as Ford employees, could no longer receive credit toward early retirement benefits under the Ford plan, even though their "post-sale service [is] identical to their pre-sale service," the plan was "constructively amended." Appellants rely for support on a Third Circuit case, *Gillis v. Hoechst–Celanese Corp.*, 4 F.3d 1137 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994). There, the court indicated that a sale of a corporate subsidiary, which resulted in cutting off the right of employees hired by the purchaser to accrue early retirement benefits under the seller's (their old employer's) plan, was a "constructive amendment" of the plan. In *Gillis,* however, the seller transferred all of the plan's liabilities and assets to the purchaser and the primary dispute involved the question of

---

1. Ford employees are entitled to severance benefits but not in the event that Ford sells a portion of its operations and the purchaser offers em-

ployees at the operation at least 80% of their Ford salary. UCS offered the DCS employees 100%.

whether sufficient assets were transferred. Although the language in *Gillis* is broad enough to support appellants' position, only recently the Third Circuit in *Dade v. North American Philips Corp.*, 68 F.3d 1558 (1995), rejected a claim similar to appellants', limiting *Gillis* to a situation where there is a plan spin-off to the acquiring company. Where an employer merely sells a separate business unit, the *Dade* court held there is no plan amendment. *Id.* at 1560.

■ In any event, appellants' argument is foreclosed in this circuit by *Stewart v. National Shopmen Pension Fund*, 730 F.2d 1552 (D.C.Cir.), *cert. denied*, 469 U.S. 834, 105 S.Ct. 127, 83 L.Ed.2d 68 (1984). *Stewart* involved a multi-employer plan where one employer stopped making contributions to the plan, leaving it underfunded as to that employer's employees. The trustees of the multi-employer plan, pursuant to authority granted them by the terms of the plan, decided to reduce the accrued benefits to those employees. We concluded that this reduction did not violate § 203's minimum vesting requirements because the trustees' actions were exempted under § 203(a)(3)(E).[2] In rejecting the argument that the trustees' actions violated § 204(g), we determined that there was no amendment to the plan. We explained that the "word 'amendment' is used as a word of limitation. Congress did *not* state that any change would trigger [§ 204(g) ]; it stated that any change *by amendment* would do so.... In its present form, § 204(g) is specifically limited to *actual amendments* ..." *Id.* at 1561, 1563 (emphasis in original). Appellants' efforts to distinguish *Stewart* are quite unpersuasive. Appellants point out that early retirement benefits were not treated as accrued benefits at the time *Stewart* was decided; Congress only extended that protection in 1984. We frankly cannot imagine any reason why that point is relevant to an understanding of *Stewart*'s reasoning. Nor do we think *Stewart* can be

limited logically to situations where the actions in question are specifically authorized by other provisions of ERISA.

■ Appellants stress ERISA's general remedial purpose. But the Supreme Court has emphasized that ERISA is a "comprehensive and reticulated statute" which was the product of a decade of congressional study. *Mertens v. Hewitt Assocs.*, —— U.S. ——, ——, 113 S.Ct. 2063, 2065, 124 L.Ed.2d 161 (1993) (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 361, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980)); *see also Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147–48, 105 S.Ct. 3085, 3092–93, 87 L.Ed.2d 96 (1985); *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 510, 101 S.Ct. 1895, 1899–1900, 68 L.Ed.2d 402 (1981). As a result of the numerous compromises between powerful competing interest groups that ERISA embodies, the length of the legislative process that lead to its enactment, its detail, and complexity, the Court has placed particular importance on the statutory text. *See Mertens*, —— U.S. at ——, 113 S.Ct. at 2071. Reliance on free-floating notions of the "purposes" of ERISA is not an acceptable method of statutory interpretation.[3] As the Court pointed out in *Rodriguez v. United States*, 480 U.S. 522, 525–26, 107 S.Ct. 1391, 1393–94, 94 L.Ed.2d 533 (1987) (emphasis in original), and restated in *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 646–47, 110 S.Ct. 2668, 2675–76, 110 L.Ed.2d 579 (1990),

> [N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.

---

2. Section 203, 20 U.S.C. § 1053 (1985), sets forth "minimum vesting standards that private pension plans must meet," which generally include nonforfeitability of benefits upon the occurrence of certain conditions. *Stewart*, 730 F.2d at 1558. But § 203(a)(3)(E) allows multi-employer plans to refuse to pay "benefits accrued as a result of service with the participant's employer

before the employer had an obligation to contribute under the plan ..."

3. Examining legislative history to clarify ambiguous statutory language, as we do *infra*, is another matter.

*See also* Frank H. Easterbrook, *Statutes' Domains*, 50 U.Chi.L.Rev. 533, 544–48 (1983). Accordingly, we reiterate the view expressed in *Stewart;* § 204(g) is limited to actual amendments. It is clear that a sale of subsidiary does not constitute an actual amendment.

### III.

Appellants alternatively argue that the district court erred in granting summary judgment on the § 510 claim. In particular, appellants stress that drawing the factual inferences in their favor, the evidence establishes that the sale of DCS was motivated by a § 510 impermissible purpose. That section provides:

> It shall be unlawful for any person to *discharge, fine, suspend, expel, discipline, or discriminate against* a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C. § 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pensions Plan Disclosure Act.

29 U.S.C. § 1140 (1985) (emphasis added). It is appellants' contention that Ford's sale of DCS and, more particularly, the attendant termination of DCS' personnel as Ford employees was a "discharge" of those employees at least in part—indeed, in large part—for the purpose of preventing those employees from ultimately qualifying for early retirement benefits. Appellants insist that Ford's reasons for selling the division included consideration of Ford's expensive labor costs, of which pension benefits are not an inconsider-

able portion. In their reply brief, appellants' emphasis shifts to Ford's refusal to permit employees that were hired by DCS to continue to accrue early retirement benefits *from* Ford so that they could meet the years-of-employment-eligibility requirement and Ford's refusal to allow these employees to transfer to other Ford locations before the sale.[4]

Ford, in response, emphasizes its business reasons for selling DCS. It believed, according to contemporaneous Ford documents, that it should not try to compete in the fast moving computer business—not its core expertise. Ford employees at DCS were apparently younger with fewer years of service than the typical Ford employee, making it improbable that this division would be sold in order to avoid early retirement benefits. Ford also points to the efforts it made to negotiate with potential buyers a comparable benefit package to Ford's, which resulted in an UCS cash benefit bonus and a replication of Ford's severance benefits for one year. As noted, Ford itself distributed a "Welcome Aboard" cash bonus to the FDCS employees and one month's free coverage under Ford's welfare benefit plans.

■ It does seem rather unlikely that Ford's basic decision to sell the operation would have been driven by the benefit packages of its employees which, after all, were standard company-wide.[5] Indeed, in their reply brief, appellants conceded that "evidence of unlawful motivation is scant" with respect to Ford's decision to sell DCS. Ford and the district court's opinion point out that five of the six circuit courts to have addressed the question whether a corporate organizational change, such as a decision to sell a subsidiary, violated § 510 have easily rejected such claims at the summary judg-

---

4. A number of these employees were subsequently discharged by UCS which appellants claim Ford knew would happen. Ford denies this and emphasizes its successful efforts to rehire employees who were let go by UCS.

5. Of course, even if DCS employees had lower benefit costs, it could still be true that Ford selected DCS for sale, instead of other Ford subsidiaries, because of benefit considerations. It is not the level of benefits at the subsidiary but the *difference* between the level of benefits at the

subsidiary and the level of benefits that the buyer will provide that is relevant. Assuming that the savings are divided equally between seller and buyer, Ford could expect to save 50% of the difference. Ford itself contends that benefits are significantly lower in the computer industry, thereby making it unlikely that a buyer will offer comparable benefits. This suggests that DCS could have been selected even if it had lower level benefits vis-a-vis other Ford employees.

ment stage. *See Daughtrey v. Honeywell, Inc.,* 3 F.3d 1488 (11th Cir.1993); *Unida v. Levi Strauss & Co.,* 986 F.2d 970 (5th Cir. 1993); *Varhola v. Doe,* 820 F.2d 809 (6th Cir.1987) (alleged § 510 discrimination between groups of employees); *West v. Greyhound Corp.,* 813 F.2d 951 (9th Cir.1987); *Aronson v. Servus Rubber, Div. of Chromalloy,* 730 F.2d 12 (1st Cir.) (alleged § 510 discrimination between groups of employees), *cert. denied,* 469 U.S. 1017, 105 S.Ct. 431, 83 L.Ed.2d 357 (1984); *but see Gavalik v. Continental Can Co.,* 812 F.2d 834 (3d Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987) (holding, after examining the evidence adduced at a bench trial, that a company's decision to close down a production line, among other actions, constituted a violation of § 510). Although typically plaintiffs produce evidence that potential benefit costs contributed in some manner to an organizational decision, the courts of appeals have thought it inappropriate to afford plaintiffs a full trial in order to determine how much of a company's motivation can be attributed to a desire to avoid benefit costs.

On the other hand, if *individual* employees are discharged in the absence of an organizational change, courts treat such a claim akin to a Title VII case using the classic *Burdine* framework, *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), to consider whether the plaintiffs have established a *prima facie* case and thereafter to determine how the burdens of production are to be allocated. *See, e.g., Rath v. Selection Research, Inc.,* 978 F.2d 1087 (8th Cir.1992); *Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231 (4th Cir.1991). Under that approach, it is less difficult for a plaintiff to show sufficient evidence to make out a *prima facie* case of unlawful motivation and thereby

avoid summary judgment.[6] The courts' reluctance to grant summary judgment in these cases stands in sharp contrast to their treatment of cases challenging an organizational decision. This contrast is particularly puzzling because it is highly unlikely that an organizational decision would not be motivated, at least in part, by benefit considerations. This pattern suggests to us that our sister circuit courts have implicitly recognized that a corporate organizational change that results in the termination of employees is really not a prototype of the sort of action that § 510 was primarily designed to cover.

Examining the language of § 510 closely, one notes that the word "discharge" is included along with the words "fine, suspend, expel, discipline, or discriminate," all words that connote actions aimed directly at individuals. The principle of statutory construction, *noscitur a sociis,* suggests that "discharge," as do "fine, suspend, expel, discipline, or discriminate," typically refers to an action targeted at an individual employee.[7] These words are used first in the section to ban a company from *retaliating* against an employee for exercising "any right" under the statute, and then the same words prohibit interference with an employee's *attainment* of "any right." Although the word "discharge" can have varying meanings—it is sometimes used to refer to any employment termination including a permanent layoff caused by impersonal factors—more often it is used to refer to a personalized decision. In this case, it seems rather clear to us that Congress was using the word "discharge" in the latter sense—which means an employer's decision to sell or close down an operation would not normally implicate § 510 merely because the action caused the termination of employees. If Congress had wished for § 510 to apply routinely to such decisions,

---

**6.** Ford assumes that the *Burdine* framework applies to organizational decisions as well as actions against individuals; it simply argues that, in this case, the plaintiff did not adduce sufficient evidence to withstand a summary judgment motion.

**7.** When confronted with the question of the appropriate statute of limitations for § 510, the courts of appeals have often applied a state's wrongful discharge or employment discrimination statute. *See, e.g., Hinton v. Pac. Enters.,* 5

F.3d 391 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1833, 128 L.Ed.2d 462 (1994) (analogizing a § 510 claim to a wrongful termination claim); *Byrd v. MacPapers, Inc.,* 961 F.2d 157 (11th Cir.1992) (concluding that a § 510 claim was most closely analogous to claims for discharge in retaliation for filing workers' compensation claims); *McClure v. Zoecon, Inc.,* 936 F.2d 777 (5th Cir.1991) (applying the tort statute of limitations to a § 510 claim).

which are virtually always based, at least in part, on labor costs, it would surely have included the terms "layoff" and "termination."

The legislative history supports this interpretation. As the Sixth Circuit in *West v. Butler*, 621 F.2d 240, 245 (6th Cir.1980), explained, the "legislative history reveals that the [§ 510 was] aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." The Senate Report on the provision that eventually became § 510 states:

> These provisions were added by the Committee in the face of evidence that in some plans a worker's pension rights or the expectations of those rights were interfered with by the use of *economic sanctions or violent reprisals*. Although the instances of these occurrences are relatively small in number, the Committee has concluded that safeguards are required to preclude this type of abuse from being carried out and in order to completely secure the rights and expectations brought into being by this landmark reform legislation.

S.REP. No. 93–127, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.CODE CONG. & ADMIN.NEWS 4838, 4872 (1974) (emphasis added). Selling a subsidiary is not an "economic sanction" or a "violent reprisal," nor are such actions "relatively small in number." One of the leading supporters of the ERISA bill, Senator Williams, when introducing the Conference Report to the Senate, explained that "[a] further protection for employees is the prohibition against discharge, or *other discriminatory conduct* toward participants and beneficiaries which is designed to interfere with attainment of vested benefits or other rights under the bill ..." 120 CONG.REC. 29,933 (1974) (emphasis added). The obvious implication is that "discharge" should be construed as referring to discriminatory, viz targeted, actions. Senator Hartke asked whether there was not "a direct, positive incentive for every employer to fire a person [assuming that some of that person's benefits will vest when he turns 30,] when he reaches 29 years and 364 days of age?" Senator

Javits responded by noting that he had "included an express amendment on that score which would provide a remedy" in such a situation, and that § 510 addressed "precisely the areas to which the Senator refers." 119 CONG.REC. 30,044 (1973). The Supreme Court has implicitly adopted this view of congressional intent. The Court, in *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 143, 111 S.Ct. 478, 485, 112 L.Ed.2d 474 (1990), described a claim that an employer fired an employee who had worked for the company for over nine years, four months before his pension would have vested, allegedly in order to avoid making contributions to his pension fund as "prototypical of the kind [of claim that] Congress intended to cover under § 510."

■ This is not to say that § 510 could never be implicated in a company's basic organizational decision. If, for example, a plaintiff produced evidence that a particular company determined that 20 of its employees were soon to become eligible for a rich benefits package and noted that 19 of those employees were conveniently located in one subdivision with perhaps only a few other employees—a company shutdown of that operation might be only an indirect method of discharging those high benefit employees. In such a situation, the organization's decision merely masks a determination to interfere with the employees' attainment of benefit plan rights. Accordingly, we think that as applied to sale or closure of an entire unit, the plaintiffs can satisfy § 510 only by showing that some ERISA-related characteristic special to the unit (such as its having a clearly above-average proportion of employees with pension rights about to vest) was essential to the firm's selecting the unit for closure or sale.

*Gavalik*, the one outlier in the court of appeal's opinions construing § 510, involved a situation which approaches—if it does not quite fit—our view of the statutory paradigm. There, in a case appealed after a full trial, the Third Circuit concluded that a decision to close down a production line causing a "loss of employment," also described as "loss of work," and "layoffs," constituted a § 510 violation. The company had developed a "li-

ability avoidance" program which authorized plant managers to shift business to plants that either had low unfunded pension liabilities or plants that needed work in order to retain workers with vested benefits. The court stated that "[f]rom our review of the entire record, we are convinced that the desire to defeat pension eligibility was a 'determinative' factor in each of Continental's challenged actions. A finding to the contrary would be clearly erroneous." *Gavalik*, 812 F.2d at 864 (citation omitted). However, the court does not focus on the meaning of "discharge" in § 510; indeed, with respect to one of the claims, it even states "that actual deprivation is not a prerequisite to class liability under § 510." *Id.* at 856.

■ Of course, even after an organizational decision, determinations as to which individuals, if any, are to be retained by the selling company might implicate § 510. In this case, however, since Ford was selling a going business to UCS, Ford naturally wished all of the existing employees to go with the business; otherwise its value to the purchaser would be less. It is undisputed that "UCS considered the DCS workforce one of the primary assets of the business and essential to its long-term success." (That UCS wished to examine the transferred employees to determine which it wished to keep permanently is also not surprising.) Appellants make no contention that individual employees were treated discriminatorily vis-a-vis other employees. As we understand their position, Ford was obliged to offer them all continued employment at Ford. Given the business realities that is just another way of challenging the sale itself. As to appellants' alternative suggestion that Ford was obliged to allow non-Ford employees to continue to accrue ("grow into") benefits under a Ford plan, we think that claim is far removed from any reasonable construction of § 510. Restated, that is nothing more than a claim that a firm violates § 510 when it fails to take a step that would give a set of employees substitutes for benefits that they would have had under the company plan in the absence of the basic corporate sale or closure. That simply cannot be, for it would mean that any downsizing firm would always have to give employees the expected value of

their plan benefits, which would in effect be an amendment of the plan in favor of the employees.

For the preceding reasons, we hold that Ford's sale of DCS does not implicate § 204(g) or § 510.

*Affirmed.*