Denice **LESSARD**, Plaintiff–Appellant,

v.

**APPLIED RISK MANAGEMENT; MMI Companies; Professional Risk Management, Defendants–Appellees.**

No. 01–15648.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 12, 2002.

Filed Oct. 3, 2002.

Laurence F. Padway, Alameda, CA, for the plaintiff-appellant.

Carolyn A. Knox, San Francisco, CA, for the defendant-appellee.

Stephen C. Tedesco, San Francisco, CA, for defendant-appellee Prof. Risk Management.

Before: SCHROEDER, Chief Judge, B. FLETCHER and KOZINSKI, Circuit Judges.

BETTY B. FLETCHER, Circuit Judge.

Plaintiff–Appellant Lessard appeals a grant of summary judgment on her claim that Defendants Appellees Applied Risk Management, Inc. ("ARM"), its successor, Professional Risk Management ("PRM"), and the parent of PRM, MMI Companies, Inc. ("MMI"), violated section 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140, when Lessard's medical benefits were terminated following the sale of ARM's assets to PRM and Lessard was subsequently denied benefits under the new plan established by PRM/MMI. Because we find that the Asset Sale Agreement ("Agreement") between the defendants facially discriminated against persons on disability and medical leave, we reverse the decision of the district court and remand for judgment and an award of damages in favor of the Plaintiff–Appellant.

## I. FACTUAL BACKGROUND

Denice Lessard began working as a workers' compensation analyst for ARM in February 1996. In the course of her employment with ARM, Lessard enrolled in a self-funded employee welfare benefits plan, the Group Benefit Plan ("Plan"), administered by ARM. As a Plan participant, Lessard was entitled to participate in the medical portion of the Plan. Following a work-related injury to her spine, Lessard left active employment in October 1996 on workers' compensation leave while maintaining her coverage under the Plan. She has not returned to active employment status since May 1997, and she has not sought employment since her spinal fusion surgery in January 1998.

On February 1, 1999, ARM entered into an agreement with PRM, a subsidiary of MMI, for the sale of ARM's assets to PRM/MMI. Under the Agreement, ARM was required to continue funding the Plan through February 28, 1999, when its Plan was finally terminated. Pursuant to conditions that are the subject of this lawsuit, ARM employees were automatically transferred to active employment with PRM/MMI coincident with the execution of the sale. Transfer of the seller's labor force permitted the purchaser to acquire the seller's assets without a break in business operations. ARM employees transferred to employment with the new company were covered under its welfare benefits plan without an interruption in coverage since they were covered under the new plan upon the termination of the ARM plan.

In the Agreement, ARM and PRM/MMI attached one condition to each employee's automatic transfer to employment with the latter company: In order to be eligible for transfer, the employee had to be actively employed by ARM (i.e., "at work") on the day of the sale or on non-medical, non-extended leave from active employment. However, the Agreement excepted from the condition employees who were on vacation or who had taken a personal day and thus were not "at work" on February 1. If an employee was on medical, disability, workers' compensation or other extended leave at the time of the sale, such employee would become eligible for transfer only "if and when he or she returns to active employment."[1] Section 7.2(a) of the

---

1. Section 7.2(a) of the Agreement provides:

At closing, each employee ... of the Company listed on Schedule 7.2(a) shall become an employee of the Buyer (a "Transferred Employee"), provided that any employee who is absent from active employment on the Closing Date by reason of disability, leave of absence, workers' compensation leave or similar circumstance (but not vacation, holiday, or personal days) shall only become a Transferred Employee if and

Agreement in fact provided a separate transfer "schedule"[2] for employees, such as Lessard, who were on medical or other extended leave on the day of the sale. ARM automatically transferred roughly 250 employees to PRM/MMI with the rest of its business assets, leaving only six employees to conform to the requirements of this special schedule: three, including Lessard, on workers' compensation leave; two on maternity leave; and one on leave of absence to prepare for a bar examination.

PRM/MMI has stipulated that if any of these employees were to return to work, that employee would be given a position with PRM including full medical benefits. Lessard understood that she could become an employee of PRM/MMI if she were released to work. However, as of September 29, 2000, Lessard still had not been released to return to work by any physician, and the prognosis for her future return to full-time employment is poor.

Lessard commenced this action in state court, bringing claims under state law and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* MMI removed the action to federal district court on the basis of federal question jurisdiction. The district court dismissed Lessard's ADA claim on defendants' motion, following Lessard's concession that she had failed to exhaust her administrative remedies. In addition, the court held that Lessard's several state law claims were preempted by ERISA and instead construed them as a single claim for wrongful termination of benefits under section 510. The court thereby retained jurisdiction

over Lessard's claims because they qualify as claims for the civil enforcement of her benefits rights under section 502 of ERISA. 29 U.S.C. § 1132(a); *see also Metro. Life Ins. Co. v. Taylor,* 481 U.S. 58, 65–66, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (deducing congressional intent "to make causes of action within the scope of the civil enforcement provisions of [ERISA] removable to federal court"). Defendants moved for summary judgment, arguing that Lessard had failed to provide evidence that their termination of her health benefits was motivated by a specific intent to interfere with her exercise of protected rights under the Plan. The district court granted summary judgment on February 21, 2001, from which Lessard now appeals.

## II. STANDARD OF REVIEW

We review the district court's order granting summary judgment *de novo. See Clicks Billiards Inc. v. Sixshooters Inc.,* 251 F.3d 1252, 1257 (9th Cir.2001). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Our task is to "determine whether the evidence, viewed in a light most favorable to the non-moving party, presents any genuine issues of material fact and whether the district court correctly applied the law." *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995).

when he or she returns to active employment.

**2.** Some confusion exists as to who was actually withheld transfer under this provision, since the "Schedule 7.2(a)" provided in the record lists only five individuals—two of whom made separate employment arrangements, either by negotiating a separate contract with PRM/MMI or by leaving the busi-

ness entirely, and three of whom, including Lessard, were on workers' compensation leave. Nevertheless, all parties stipulated below that six employees were not transferred according to the conditions set forth in section 7.2(a) of the Agreement, exactly as described above, and all parties continue to agree on this point on appeal.

## III. ANALYSIS

■■■■ Section 510 provides in relevant part:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

29 U.S.C. § 1140. Section 510 incorporates the enforcement structure of ERISA's civil enforcement provision, section 502, which generally provides that civil actions may be brought by "participant[s]," "beneficiar[ies]," "fiduciar[ies]," and the Secretary of Labor. 29 U.S.C. § 1132(a). The purpose of section 510 is to "prevent persons and entities from taking actions which might cut off or interfere with a participant's ability to collect present or future benefits or which punish a participant for exercising his or her rights under an employee benefit plan." *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1134 (7th Cir.1992); *accord Blaw Knox Ret. Income Plan v. White Consolidated Industries, Inc.*, 998 F.2d 1185, 1191 (3d Cir. 1993), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994). The Supreme Court has described an employer's discharge of an employee, who had worked for the company for over nine years, four months before his pension would have vested as the "prototypical" type of claim that Congress intended to cover under section 510. *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 143, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). With respect to non-vesting welfare benefits, we follow a general rule that "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). However, as the Supreme Court stated in *Inter–Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.,* 520 U.S. 510, 117 S.Ct. 1513, 137 L.Ed.2d 763 (1997), the "right that an employer or plan sponsor may enjoy in some circumstances to unilaterally amend or eliminate its welfare benefit plan does not ... justify a departure from § 510's plain language." *Id.* at 515, 117 S.Ct. 1513.

The facts of this case are not typical since both a buyer and a seller are involved. There would be no question of ARM's liability if, without selling its assets to PRM/MMI, ARM had simply decided to retain the plan but terminate six of its employees absent for reasons of injury or illness on February 1, 1999, terminate their benefits, and attach as a condition of the reinstatement of their benefits that they return to full-time, active employment. As section 510 clearly states, it is a violation of federal law for an employer to "discharge" an employee or otherwise to "discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C. § 1140. ARM and PRM/MMI excluded the six employees who were on extended leave from the normal, or automatic, transfer schedule that included the vast majority of former ARM employees and placed them on a separate, deferred schedule. Once placed on this deferred schedule, these employees were presumptively discharged unless and until they complied with the companies' express condition that they return to active employment. ARM acting alone would not have been permitted to terminate the benefits of a select group of employees—most of whom were high-rate users of the company's Plan—because those employees were on medical leave and to offer those employees reinstate-

ment of benefits only on the condition that they return to work. Nor would ARM have been permitted to terminate benefits in a way that guaranteed that employees with the worst disabilities would get the worst deal. It could not structure an agreement whose foreseeable effect is that an employee who took a leave of absence because of a bad flu could return to work with only minor difficulty and thereby resume coverage, but an employee with a major health problem could not. The same single action, jointly agreed upon and executed by the two companies, just as certainly constitutes a violation of section 510.

■ Defendants argue that the asset sale was in itself a neutral action, and that the injury of which Lessard complains was caused by her own refusal or inability to return to work. In short, defendants deny that Lessard has put forth sufficient evidence to establish their "specific intent to interfere with [her] benefit rights." *Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 457 (9th Cir.1995); *Kimbro v. Atl. Richfield Co.*, 889 F.2d 869, 881 (9th Cir.1989). In making this argument, the defendants conflate the plaintiff's burden to show a causal connection between her exercise of protected rights and the employer's reprisal in a case involving circumstantial evidence of discrimination with her burden of proof where the evidence of discrimination is direct. Following the Second Circuit's decision in *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111–12 (2d Cir.1988), we have adopted the *McDonnell Douglas* burden-shifting framework for assessing an employer's liability for discriminatory interference with a plaintiff's exercise of protected rights under section 510.[3] *Ritter*, 58 F.3d at 457–58. In *Dister*, the Second Circuit noted that the employer's discriminatory intent "is seldom the subject of direct proof." 859 F.2d at 1111. It is in such a circumstance that the burden-shifting framework of *McDonnell Douglas* provides the plaintiff's principal means of establishing liability. But we do not require a plaintiff to comply with *McDonnell Douglas* where the evidence of discrimination is direct. *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148(9th Cir.1997) ("A plaintiff can also establish a prima facie case of disparate treatment without satisfying the *McDonnell Douglas* test, if she provides evidence suggesting that the 'employment decision was based on a discriminatory criterion illegal under [Title VII].' " (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977))).

Here, Lessard's proof of discrimination is direct and uncontroverted. Section 7.2(a) of the Agreement facially discriminates against employees who were on disability, workers' compensation, and any

---

**3.** *In McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established the now familiar framework by which a Title VII plaintiff may prove disparate treatment by an employer through the use of circumstantial evidence. The Supreme Court held that the plaintiff must first establish a *prima facie* case of discrimination. *Id.* at 802, 93 S.Ct. 1817. The *prima facie* case, once established, results in a "presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The burden then shifts to the defendant to "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Id.* at 255, 101 S.Ct. 1089; *Warren v. City of Carlsbad*, 58 F.3d 439, 442 (9th Cir.1995) (discussing plaintiffs' and defendants' burdens in the Title VII context). If the defendant satisfies this burden of production, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason is a pretext for discrimination. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817; *Ritter*, 58 F.3d at 456–57.

other form of extended leave, explicitly excepting from its separate schedule for conditional transfer any employee who was absent from work due to vacation, holiday, or personal reasons. At the time the companies executed the Agreement, they knew that five of the six employees placed on the deferred schedule were on some form of medical leave or disability-related leave. We find that this conduct constitutes discrimination on its face.

The fact that Lessard, by returning to work, could have reinstituted her coverage under the new PRM/MMI plan is of no moment. Whether Lessard or defendants are more liable for the permanence of her predicament does not change the fact that she was placed in this predicament by the defendants' conduct. Whether there were any other former employees of ARM who were high-rate users of Plan benefits before the sale and who were automatically transferred to work for PRM/MMI is also inconsequential, because the fact that defendants may not have discriminated against other high-rate users of Plan benefits does not excuse their intentional discrimination against Lessard. Again, Lessard's case does not rely upon circumstantial evidence from which a causal connection must be deduced. Absence from work due to disability or medical leave is a clear, even if incomplete, proxy for high rate of use of health benefits. The fact that the companies could have been more inclusive in their targeting of high-rate users does not make them any less liable here.

Defendants argue in the alternative that they cannot be held liable for a termination of benefits that occurred incident to a corporate reorganization. Our decision in *West v. Greyhound Corp.*, 813 F.2d 951 (9th Cir.1987), might appear to lend support to their argument. In that case, we held that " 'a purchaser of assets is under no obligation to hire employees of a prede-cessor and is free to set the initial terms of employment for these employees should it decide to hire them.' " *Id.* at 955(quoting *Bellingham Frozen Foods, Inc. v. NLRB*, 626 F.2d 674, 678 (9th Cir.1980)). *West* concerned a challenge by former employees of Greyhound who, following a sale of Greyhound's assets that resulted in their termination, claimed that they had been discriminated against because the new employer refused to hire them subject to the plaintiffs' condition that they be enrolled in a welfare benefits plan at least equal in value to the one under which they were previously covered in the course of their employment with Greyhound. *Id.* at 953. We concluded that "no violation of section [510] of ERISA is shown where the seller of a business terminates employment under the provisions of a collective bargaining agreement and the purchaser refuses to hire any of the employees because they refuse to accept a reduction of unaccrued employee benefits." *Id.* at 955.

Following the Supreme Court's admonition in *Inter–Modal Rail*, 520 U.S. at 515, 117 S.Ct. 1513, we do not read West to permit two or more companies incident to an asset sale to take joint action that violates the express terms of the statute. As stated above, we find that section 510 is violated when an employer selects for presumptive termination and denial of benefits specifically those employees presently on medical or disability leave. Our holding in West that the purchasing company in an asset sale has a right to set the level of benefits available to transferred employees is inapposite. Defendants here would have been permitted under West to transfer all former ARM employees to PRM/MMI subject to a reduction in benefits *for all employees;* but they were not permitted to exclude a select group of employees from immediate transfer because they were not "at work" on the day of transfer for health-related reasons. These employ-

ees could just as easily have been transferred to the new plan which, even if it had resulted in a reduction of their benefits, would have been lawful so long as on-leave employees were not especially penalized.

We are, furthermore, unpersuaded by defendants' argument that our holding them liable for violating section 510 contradicts the holding of the D.C. Circuit in *Andes v. Ford Motor Co.*, 70 F.3d 1332 (D.C.Cir.1995). In *Andes*, sixty former employees of Dealer Computer Services ("DCS"), a subsidiary of Ford Motor Company, were given the option of accepting employment with DCS's successor "at 100% of their Ford salaries, excluding benefits, or lose their jobs," as a result of Ford's sale of DCS to Universal Computer Services. *Id.* at 1333. The plaintiffs argued that they should be permitted to "grow into" early retirement benefits under the Ford General Retirement Plan, even though they were no longer Ford employees after the asset sale. *Id.* The court construed the plaintiffs' section 510 claim to assert that "a firm violates § 510 when it fails to take a step that would give a set of employees substitutes for benefits that they would have had under the company plan in the absence of the basic corporate sale." *Id.* at 1339. The court disagreed that the plaintiffs' theory properly stated grounds for liability under section 510, because it would mean that "any downsizing firm would always have to give employees the expected value of their plan benefits," in effect amending the plan in favor of the employees. *Id. Andes* is inapposite to the case at bar for two reasons. First, Ford did not select which employees would lose benefits on the basis of their use of medical leave; it simply gave all former DCS employees the option of transferring to the new company under the condition that they lose pension benefits that had not yet vested under the Ford plan. Second, Lessard does not claim to have been discriminated against by a re-

duction in benefits below what she would have received under the ARM Plan. She claims a violation of the statute based on the fact that, because she was on medical leave on the date of the asset sale, she has lost all her benefits coverage while employees who were at work or merely on vacation on that day were transferred with full benefits under the PRM/MMI plan.

Even the *Andes* court recognized that, following a corporate asset sale, "determinations as to which individuals, if any, are to be retained by the selling company might implicate § 510." *Id.* at 1339. We find the present case a prime example of such a circumstance, and we hold against the defendants. The only question that remains is the extent of each defendant's liability. Ordinarily "a corporation which purchases the assets of another corporation does not thereby become liable for the selling corporation's obligations." Harry G. Henn & John R. Alexander, *Laws of Corporations* 967 (3d ed.1983). However, courts make exceptions for corporate mergers fraudulently executed to avoid the predecessor's liabilities, *id.*, or for transactions where the purchaser has specified which liabilities it intends to assume, *see Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1425 (7th Cir.1993). On remand, the district court is directed to award judgment in favor of Lessard, the extent of each defendant's liability and the amount of damages to be determined in further proceedings.

**REVERSED AND REMANDED WITH DIRECTION.**

KOZINSKI, Circuit Judge, concurring:

This ploy to dump workers on long-term disability violates ERISA for the reasons cogently explained in Judge Fletcher's opinion, plus one more: It runs afoul of the "too clever by half" doctrine. *See, e.g., Foster v. Dalton,* 71 F.3d 52, 56 (1st Cir.

1995) (Selya, J.); *Sisters of the Third Order of St. Francis v. SwedishAmerican Group Health Benefit Trust*, 901 F.2d 1369, 1372–73 (7th Cir.1990) (Easterbrook, J.). Parties acting in concert can't get away with what they couldn't do separately. *See* Maj. Op. at 1023. The lawyers who papered this transaction should have advised against it, and the clients should have heeded the warning. One hopes, perhaps in vain, that future lawyers and clients will know better.