RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0124p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JERRY CRAWFORD, et al.,

              *Plaintiffs-Appellants,*

*v.*

TRW AUTOMOTIVE U.S. LLC,

              *Defendant-Appellee.*

Nos. 08-1132/1777

> Appeal from the United States District Court
> for the Eastern District of Michigan at Detroit.
> No. 06-14276—Patrick J. Duggan, District Judge.

Argued: January 20, 2009

Decided and Filed: March 31, 2009

Before: MARTIN and COOK, Circuit Judges; WATSON, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Jeanne E. Mirer, EISNER & MIRER, New York, New York, for Appellants. Robert M. Vercruysse, VERCRUYSSE, MURRAY & CALZONE, Bingham Farms, Michigan, for Appellee. **ON BRIEF:** Jeanne E. Mirer, EISNER & MIRER, New York, New York, for Appellants. Robert M. Vercruysse, William E. Altman, VERCRUYSSE, MURRAY & CALZONE, Bingham Farms, Michigan, Brian A. Paton, TRW AUTOMOTIVE, Livonia, Michigan, for Appellee.

_____

## OPINION

_____

    BOYCE F. MARTIN, JR., Circuit Judge. Plaintiffs, a class of former TRW Automotive employees, allege that TRW violated the Employee Retirement and Income

_____

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

Security Act by closing the plant where they worked to interfere with the vesting of their retirement benefits. The district court disagreed, and granted the company's motion for summary judgment. We affirm.

I.

TRW, an indirect subsidiary of TRW Automotive Holdings Corporation, owned and operated the Van Dyke plant where plaintiffs worked. Van Dyke, a 370,000 square foot facility, was part of TRW's North American Braking and Suspension Group: workers there manufactured front suspension components for various car makers. Its employees, represented by the United Auto Workers, were covered by a collective bargaining agreement between TRW and the UAW, and a defined pension plan. Under the pension plan, employees who retired with thirty or more years of "benefit service" were entitled to retirement benefits; they earned benefit service for each year that they worked over 1680 hours, though if laid-off they only needed 170 hours to get a year's credit. Employees who retired with 10 years of service and were 55 or older were entitled to an early benefit.

TRW claims that, as of 2004, it faced overcapacity problems which hampered profits. In response, it organized a group to research the costs and benefits of shutting down some of its North American plants. That group identified the Van Dyke plant as a prime candidate for closure. But, before making that leap, TRW considered a few alternatives. Most significantly, it considered placing at Van Dyke work for DaimlerChrysler, though this was only assembly work and not the manufacturing kind typical of Van Dyke. Ultimately, however, the company decided that Van Dyke was in fact not the right place, and the DaimlerChrysler work wound up (the record is unclear precisely how) at a plant located on Mancini Drive owned by the Kelsey-Hayes Company, a separate subsidiary of TRW Holdings. (The Mancini plant employees are not represented by a union and they do not have a defined-benefit pension plan.) So Van Dyke's days became numbered.

Shortly before TRW shut Van Dyke down, however, the company discussed with the UAW the possibility of preferentially hiring laid-off Van Dyke employees to the

Mancini plant and "bridging" the benefits of Van Dyke employees who were close to vesting.  TRW also offered a severance to employees who opted out of their available retiree benefits.  But the two sides failed to reach an agreement and TRW closed Van Dyke in January 2007.  At that time, three employees missed the 30-year retirement mark by less than one year of benefit service (all three had been laid-off in 2005), and four others missed the 30-year mark by less than two years.

Plaintiffs, a certified class of former Van Dyke employees, sued, alleging that TRW violated ERISA § 510 by (1) failing to recall employees following a layoff, (2) refusing to transfer employees to the Mancini Drive facility, and (3) improperly discharging employees to interfere with their attainment of retirement eligibility.  The district court granted summary judgment to TRW on all counts, and also later dismissed plaintiffs' motion for relief from the judgment on the basis of new evidence.  Plaintiffs appeal.

## II.

Summary judgment is only appropriate when there is no genuine issue of material fact, and, in giving the claim fresh review, this Court must draw "all justifiable inferences" in the non-moving party's favor.  *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A.

Plaintiffs contend that the district court improperly granted TRW summary judgment because the company violated ERISA when it laid them off in connection with closing the Van Dyke plant. ERISA § 510 makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an employee benefit plan]." 29 U.S.C. § 1140.   This section was designed to prevent "employers from discharging or harassing" employees to preclude "them from obtaining vested pension rights." *West v. Butler*, 621 F.2d 240, 245 (6th Cir. 1980). Of course, not only is this illegal, it is also bad

business: because providing benefits is discretionary (and so part of total employee-compensation), firing older employees to reduce pension costs both creates animosity between employer and employee and makes employees' compensation less certain, and thus employees will demand higher wages to offset this heightened risk of being fired inopportunely; as a result, employers will have to pay employees higher wages to attract and keep them. *See* Maria O'Brien Hylton, *Insecure Retirement Income, Wrongful Plan Administration and Other Employee Benefits Woes—Evaluating ERISA at Age Thirty*, 53 BUFF. L. REV. 1193, 1204-11 (2005). But some employers are foolish, and thus Congress enacted § 510 to provide a remedy. Plaintiffs assert that TRW "discharge[d]" them to "interfer[e]" with their attainment of full retirement benefits in violation of § 510.

So the primary question here is whether the plaintiffs proffered enough evidence of this improper motive to get to a jury. But first we must dismiss two errant contentions: TRW asserts that ERISA interference claims in the plant sale or closing context are never actionable and plaintiffs assert that TRW violated § 510 by failing to recall or transfer them following their discharge. Neither is correct.

1.

TRW overreaches in stating that employees may never challenge discharges that result from a plant-closing decision. While "[e]mployers or other plan sponsors are generally free under ERISA . . . to adopt, modify or terminate" pension benefit plans, *Coomer v. Bethesda Hosp. Inc.,* 370 F.3d 499, 508 (6th Cir. 2004), this discretion does not permit them to discharge employees or alter their plan rights to "circumvent the provision of promised benefits." *Inter-Modal Rail Emples. Ass'n v. Atchison, Topeka & Santa Fe Ry.*, 520 U.S. 510, 515 (1997) (internal quotations omitted).

Of course, the D.C. Circuit has pointed out that Congress's use of the term "discharge" in § 510 comes in the context of other individually focused terms like "fine, suspend, expel, [and] discipline." *Andes v. Ford Motor Co.*, 70 F.3d 1332, 1337 (D.C. Cir. 1995). TRW latches onto this to say that broad or class-based claims are never actionable. But, as the D.C. Circuit—and other courts—have routinely recognized, the

term "discharge," by definition, is not so limited and thus covers employees fired or laid-off, either individually or as a group, and thus the statutory language gives *any* "discharged" employee a right to sue, whether via class-action or individually. *See, e.g., Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 838 (3d Cir.1987). Indeed, the *Andes* court explicitly pointed out the possibility that some employer might unscrupulously sell or close a plant to shake off employees on the cusp of establishing benefit eligibility. 70 F.3d at 1338.

2.

Plaintiffs similarly overreach in claiming that TRW was legally required to recall many of them back to or to transfer them to the Mancini plant. As stated above, § 510 includes a list of prohibited actions, including improperly "discharg[ing], fin[ing], expel[ling]," and "discriminat[ing]." But nowhere is "transferring" or "recalling" listed. Neither have plaintiffs identified caselaw giving effect to such a claim. This is not surprising: the *sine qua non* of a § 510 claim is the presence of some adverse action done to interfere with an employee's rights, and had plaintiffs not been laid-off, whether or not there was a transfer would have been irrelevant because plaintiffs would still have been accruing benefits; similarly, recall would have been irrelevant if there was no discharge or it was lawful, because employees would have no more right to be hired than someone who had never worked for TRW. In other words, the whole game is whether TRW unlawfully *discharged* plaintiffs.

Also, TRW's decision to recall some employees and not others was not discriminatory because those decisions were seniority based, and at least two employees accrued enough pension credits to retire with benefits *after* being recalled. Finally, the employees' collective bargaining agreement provided that benefits accrued only at the Van Dyke plant, so plaintiffs also lacked plan rights to be recalled. *See McGath v. Auto-Body North Shore, Inc.*, 7 F.3d 665, 670 (7th Cir. 1993).

A final detour before the main event: plaintiffs, in support of their theory that § 510 gives them a right to be recalled or transferred, try to import two doctrines into ERISA law: the corporate "alter-ego" doctrine, *see Yolton v. El Paso Tenn. Pipeline Co.*,

435 F.3d 571, 587 (6th Cir. 2006), and the labor law "double-breasting" doctrine, *see NLRB v. Fullerton Transfer & Storage, Ltd., Inc.*, 910 F.2d 331, 336 n.7 (6th Cir. 1990). The idea seems to be that the plaintiffs view the Mancini plant as the successor or "alter-ego" of the defunct Van Dyke plant. But, setting aside the nuanced analysis required to explain if and how these doctrines would apply to two plants both owned by the same company—rather than to a successor entity—it is unclear what satisfying these tests would get plaintiffs. Suppose the Mancini plant was the "alter ego" of Van Dyke: plaintiffs would still not be entitled to a transfer, because their plan granted them no such right and neither would they be entitled to a separate recall, so long as the original discharge was lawful. So, we decline the invitation to apply these two doctrines to ERISA law because any conclusion would be irrelevant to our decision today. Thus, § 510 does not include the right to be recalled or transferred if the discharge itself was lawful. We now turn to that question.

B.

To defeat summary judgment, the plaintiffs must show that TRW fired them for the purpose of interfering with the attainment of their retirement benefits. 29 U.S.C. § 1140. Plaintiffs may make this showing either through direct or circumstantial evidence, with the latter via the ubiquitous burden-shifting framework that has, like some B-movie villain, devoured nearly every area of law with which it has come into contact. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiffs here rely on circumstantial evidence. In the ERISA context, the burden-shifting framework first requires the plaintiffs to establish their "prima facie" case "by showing the existence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997). Although some of the cases discuss, in reference to this "prima facie" case, the need for the plaintiff to prove the existence of the employer's "specific intent," *see, e.g., Schweitzer v. Teamsters Local 100*, 413 F.3d 533, 537 (6th Cir. 2005); *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir.

1992), that requirement is superfluous and not relevant (at this first stage at least) because it gets to the ultimate question of whether the employer purposefully interfered with the employee's pension rights. This confusion stems in part because the term "prima facie" as used here, does not comport with the traditional understanding of that term—namely, that plaintiffs have proven enough to get to a jury, *see* 9 WIGMORE ON EVIDENCE § 2494, 378-79 nn. 1,3 (1981).

Instead, "prima facie" is *Burdine/McDonnell-Douglas patois* for the fact that the plaintiffs have shown enough to create a rebuttable presumption such that the employer must then produce evidence supporting a legitimate, non-discriminatory reason for the discharge. *Humphreys*, 966 F.2d at 1043; *see also Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1113-14 (6th Cir. 2001) ("A plaintiff's burden in establishing a prima facie case is not intended to be an onerous one."). If the employer makes this showing, the burden shifts back to the plaintiff to show that this proffered reason was a "pretext"—i.e. a phony reason—and instead that the intent to interfere with the plaintiff's ERISA rights was a "motivating factor." *Id.*

The plaintiffs easily satisfy the low-threshold for establishing their prima facie case. TRW's Vice President of Operations for the Suspension Group stated that pension costs—colloquially known within the company as "legacy" or "heritage" costs—were among the reasons to close down the plant. And that is no surprise: labor costs are often among the largest costs for a plant, and such "legacy" or retirement and benefits costs typically make up the largest portion of labor costs. *See* Hylton, 55 BUFF. L. REV. at 1204-11. Indeed, as the district court observed, the work done at Van Dyke was transferred to a non-union facility where such costs "were reduced or non-existent." This is enough to erect the presumption and require TRW to make an evidentiary showing.

TRW thus replies that it closed Van Dyke because of its overcapacity: only 30,000 square feet of its available 300,000 square feet was being used, so roughly 26% of every sales dollar went to fixed costs and overhead. This is a strong non-

discriminatory reason, especially when coupled with the fact that there are necessarily a variety of concerns at play whenever a company decides to shut down a plant.

So we reach the "pretext" stage. Plaintiffs retort that TRW's proffered reason is phony because the plant was so poorly run; specifically, that the company could have kept Van Dyke going if it had cut a variety of possible costs and placed the DaimlerChrysler work there.  Thus, plaintiffs argue, because they did not do those things, it must have been the company's desire to interfere with their pension benefits that motivated it to close their plant.  TRW, predictably, retorts that, since its stated reason concerned "business judgment," then its reason is unassailable.  In support, TRW quotes dicta from the cases, like: "Measures designed to reduce costs in general that also result in an incidental reduction in benefit expenses do not suggest discriminatory intent." *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1492 (11th Cir. 1993).

But of course: the whole issue is whether reducing pension benefits by shutting down a plant with employees close to vesting was a "motivating factor" or was instead "incidental" because there were other, neutral, business reasons at play.  *See Smith*, 129 F.3d at 865.  "Business judgment" is not an aegis that deflects all ERISA interference liability; Congress, in enacting § 510, made clear its view that an employer may only discharge employees when neutral, non-pension right-interfering concerns animate the decision.

And, while plaintiffs may not second-guess every business decisions, the reasons supporting any decision to discharge an employee, either individually or in connection with a plant closing, may be considered "to the extent that such an inquiry sheds light on whether the employer's proper reason for the employment action was its actual motivation." *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 576 (6th Cir. 2003) (en banc).  In other words, business judgments are relevant insofar as plaintiffs can show that they are incredible or phony, which, while difficult, is not categorically barred, as TRW seems to think.

To support their claim that TRW's overcapacity justification was pretext, plaintiffs point to a variety of documents indicating TRW's desire to reduce pension

costs and that reducing these costs played a definite role in TRW's decision to shut down Van Dyke. And, of course, TRW has not denied this. Nevertheless, plaintiffs cannot satisfy their burden of persuasion. At the pretext stage, judges must still bring their judgment to bear on whether or not plaintiffs have met their burden—in effect, the *Burdine/McDonnell-Douglas* framework has fallen away and the question reduces to whether plaintiffs can prove improper motivation. And, despite plaintiffs' evidence, we cannot say that TRW's reason was a mere pretext.

When the plant was shut down and the employees laid-off, only three employees were within a year of reaching eligibility, while another four were roughly two years away; a majority of the Van Dyke employees needed more than five more years for their benefits to fully vest. And two of the employees that TRW did recall—which was done on the basis of seniority per the bargaining agreement—established their benefits eligibility while working at the Mancini plant. This undercuts the plaintiffs' claim.

Although TRW vastly overstated the deference its business decisions are afforded, it is true that, when plants are shut down, there will necessarily be a variety of factors at play beyond how close certain employees might be to vesting, and thus plaintiffs have a lot to wade through to establish liability. This is not due to any presumption or legal threshold erected against their claims; the facts of these cases will always be myriad and complicated, and plaintiffs must show that the employer, in the midst of all this, in some way targeted certain employee benefits or rights for interference. This is not to say that employers always act properly—some are foolish—it is instead that the facts do not always make it obvious that this was so. To succeed, § 510 plaintiffs do not need "smoking gun" evidence, but, they do need more than plaintiffs have here. We thus affirm the district court's grant of summary judgment to TRW.

III.

Finally, plaintiffs also claim that the district court improperly denied their motion for relief from judgment on the basis of newly discovered evidence. *See* Fed. R. Civ. P. 60(b)(2). That denial is reviewed for abuse of discretion. *Good v. Ohio Edison Co.*, 149 F.3d 413, 423 (6th Cir. 1998). To prevail, the moving party must show that it used "due diligence" in obtaining the information and that the evidence is so material that it is outcome determinative—that the ultimate result would have been different were plaintiffs to have had the evidence. *Id.*

Plaintiffs relied on two pieces of evidence in support of their motion. First, they relied on an affidavit of plaintiff Matthew Burdo stating that, in February 2008, he had spoken with a man named "Dave" who was sitting in the Mancini Drive plant's parking lot eating in a sandwich. "Dave" stated that the Mancini facility had been expanded and that there was an additional facility going up across the street. Second, plaintiffs relied on documents showing that a building permit was issued in June 2007 to expand the Mancini plant. The district court concluded that plaintiffs failed to exercise due diligence in gathering this evidence because they (a) failed to identify any obstacles to their obtaining it, (b) the Mancini facility's expansion was outwardly visible to anyone who visited, and (c) plaintiffs could have spoken to employees at any earlier time to inquire of what kind of work they were engaged in. Nevertheless, the district court further concluded that, even assuming diligence, the new evidence would not have altered the ultimate conclusion. We agree.

As observed above, the Van Dyke plant was shut down largely due to overcapacity concerns, and the Mancini-expansion would not have altered this calculus: even with the expansion, the Mancini plant would still be less than a third of the size of the Van Dyke one (85,000 square feet compared with 300,000). Moreover, that decision came some time after the decision was made to discharge these employees and shut down Van Dyke, and thus was remote from the decision to close it down. Finally, we agree with the district court that the information contained in Burdo's affidavit—which relies almost entirely on statements made by sandwich "Dave"—even where admissible,

were not entirely credible: we do not even know for sure if he was a TRW employee. Thus, the district court properly denied plaintiffs' 60(b) motion.[1]

## IV.

For the above reasons, we affirm.

---

[1] TRW contends that, even if plaintiffs were successful, their claim would have no remedy. They rely on the Tenth Circuit's opinion in *Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246 (10th Cir. 2004), and this Court's unpublished opinion in *Alexander v. Bosch Automotive Systems, Inc.*, 232 Fed. App'x 491(6th Cir. 2007). Plaintiffs, in turn, point out the severe criticism these decisions have received, and ask us not to follow them. *See, e.g., Millsap*, 368 F.3d at 1261 (Lucero, J., dissenting); *Eichorn v. AT&T Corp.*, 489 F.3d 590, 591-95 (3d Cir. 2007) (Ambro, J., concurring in the denial of rehearing en banc); Lorraine Schmall & Nathan Ihnes, *Failure of Equity: Discriminatory Plant Closings as an Irremediable Injury Under ERISA*, 55 CATH. U. L. REV. 81, 82 (2005) ("The appellate decision in *Millsap* was wrong."). Because we conclude that plaintiffs' claim fails on the merits, we need not wade into this murky pond, and leave resolution of that question for another day.